**LOUISVILLE & N. R. CO. et al. v. UNITED STATES.**

No. 14165.

District Court, N. D. Illinois, E. D. Nov. 23, 1934.

S. W. Baxter and H. N. Quigley, both of Cincinnati, Ohio, Jervis Langdon, Jr., of New York City, M. A. Jersild and S. C. Murray, both of Chicago, Ill., Sidney Smith and E. S. Jouett, both of Louisville, Ky., and FitzGerald Hall, of Nashville, Tenn., for plaintiffs.

Elmer B. Collins, of Washington, D. C., for the United States.

Leslie Craven, of Washington, D. C., for Federal Co-Ordinator of Transportation.

William F. Price, Minier Sargent, Arvid B. Tanner, and Ernest S. Ballard, all of Chicago, Ill., for Charles M. Thomson, trustee, Chicago & Eastern Illinois Ry. Co., intervening defendant.

Louis B. Wehle, of Washington, D. C., for Protective Committee for General Mortgage 5 per cent. Gold Bondholders of Chicago & Eastern Illinois Ry. Co.

Before EVANS, Circuit Judge, BARNES and SULLIVAN, District Judges.

PER CURIAM.

■ There is little need for findings of fact in this suit for there was no evidence offered by either side. The pleadings, together with an affidavit by defendant and certain exhibits attached to the complaint, constitute the sole basis of our findings. We view Supreme Court Equity Rule 70½ (28 USCA § 723), however, as imperative, and we accompany this memorandum with findings of fact and conclusions of law in the hope that they will clarify and shorten the statement of issues in case of an appeal.

The findings will also shorten this memorandum which is written for counsel and interested parties who are familiar with said facts.

The plaintiffs in this suit are seeking to enjoin the enforcement of an order of the Federal Co-ordinator of Transportation purporting to have been made under powers vested in him by the provisions of an Act of Congress, known as the Emergency Railroad Transportation Act 1933 (49 USCA § 250 et seq.). They raise only a question of law—the validity of the order in question. They do not contest the merits of the controversy resulting from the order.

The order complained of was entered October 25, 1934, and the part attacked reads as follows:

"And it is ordered, That the Louisville and Nashville Railroad Company and the Chicago and Eastern Illinois Railway Company (Charles M. Thomson, Trustee) be and they are hereby directed to continue the interchange of through passenger train equipment at Evansville, Indiana.

"It is further ordered, That the proposed interchange of through passenger train equipment at Evansville, Indiana, between the Louisville and Nashville Railroad Company and the Cleveland, Cincinnati, Chicago and St. Louis Railway Company (The New York Central Railroad Company, lessee) be not established."

The order was made upon findings of fact, Nos. 2, 3, and 4 of which are as follows:

"(2) That the discontinuance of the interchange of through passenger train equipment between the Louisville and Nashville Railroad and the Chicago and Eastern Illinois Railway at Evansville, Indiana, and the establishment of such interchange at Evansville, Indiana, between the Louisville and Nashville Railroad and The Cleveland, Cincinnati, Chicago and St. Louis Railway will result in unnecessary duplication of services and facilities and the elimination of a route now existing without the consent of all participating lines and will unduly impair the net earnings of the Chicago and Eastern Illinois Railway Company (Charles M. Thomson, Trustee) and will result in wastes and preventable expense.

"(3) That the Regional Coordinating Committees of the Eastern, Southern and Western groups are unable to carry out the purposes set forth in subdivision (1) of said section 254 by voluntary action and have failed to recommend to the Coordinator that he give appropriate directions to the Louisville and Nashville Railroad Company, The Cleveland, Cincinnati, Chicago and St. Louis Railway Company (The New York Central Railroad Company, lessee), and the Chicago and Eastern Illinois Railway Company (Charles M. Thomson, Trustee), by order, and have not acted with respect to the matter which the Coordinator brought to the attention of said Committees.

"(4) That an order by the Coordinator directed to the Louisville and Nashville Railroad Company and the Chicago and Eastern Illinois Railway Company (Charles M. Thomson, Trustee), directing them to continue the present interchange of through passenger train equipment at Evansville, Indiana, and directing the Louisville and Nashville Railroad Company and The Cleveland, Cincinnati, Chicago and St. Louis Railway Company (The New York Central Railroad Company, lessee) not to establish interchange of through passenger train equipment at Evansville, Indiana, will be consistent with the public interest and in furtherance of the purposes of chapter 7, title 49, U. S. Code [49 USCA § 250 et seq.]."

Defendant has advanced numerous reasons why the relief sought by plaintiffs should be denied. In view of our conclusion respecting one of them, it will be unnecessary to state the fact bases for the others.

Defendant argues that the suit should not be maintained because the administrative process provided by the statute has not been completed and the proceedings have not reached the judicial stage. In support

of this position, it is claimed that plaintiffs should have made application to the Interstate Commerce Commission for a review of the order before invoking the jurisdiction of a court of equity. Plaintiffs anticipated this objection and met it as fully and completely as the facts and the law would permit.

Section 9 of the act (49 USCA § 259) reads as follows: "Sec. 9. Any interested party, including, among others, any carrier, subsidiary, shipper, or employee, or any group of carriers, shippers, or employees, or any State commission, or the Governor of any State, or the official representative or representatives of any political subdivision thereof, dissatisfied with any order of the Coordinator *may, at any time prior to the effective date of the order,* file a petition with the Commission asking that such order be reviewed and suspended pending such review, and stating fully the reasons therefor. Such petitions shall be governed by such general rules as the Commission may establish. If the Commission, upon considering such petition and any answer or answers thereto, finds reason to believe that the order may be unjust to the petitioner or inconsistent with the public interest, the Commission is hereby authorized to grant such review and, in its discretion, the Commission may suspend the order if it finds immediate enforcement thereof would result in irreparable damage to the petitioner or work grave injury to the public interest, but if the Commission suspends an order, it shall expedite the hearing and decision on that order as much as possible. Thereupon the Commission shall, after due notice and a public hearing, review the order and take such action in accord with the purposes of this chapter as it finds to be just and consistent with the public interest, either confirming the order or setting it aside or reissuing it in modified form, and any order so confirmed or reissued shall thereafter remain in effect until vacated or modified by the Commission."

Section 16 (49 USCA § 266) provides for judicial review in the following language: "Sec. 16. Any final order made under this chapter shall be subject to the same right of relief in court by any party in interest as is now provided in respect to orders of the Commission made under chapter 1 of this title. The provisions of sections 45 and 48 of Title 28 shall be applicable to any proceeding in court brought to suspend or set aside any order of the Coordinator or of the Commission entered pursuant to the provisions of this chapter."

Defendant supports its contention that plaintiffs may not seek injunctive relief from a court of equity until it has exhausted its remedies before the Interstate Commerce Commission by the decisions in United States v. Illinois Central Ry., 291 U. S. 457, 54 S. Ct. 471, 78 L. Ed. 909; Porter v. Investors' Syndicate, 286 U. S. 461, 52 S. Ct. 617, 76 L. Ed. 1226; White v. Johnson, 282 U. S. 367, 51 S. Ct. 115, 75 L. Ed. 388; Hegeman Farms Corp. v. Baldwin, 293 U. S. 163, 55 S. Ct. 7, 79 L. Ed. ——, decided Nov. 5, 1934.

Plaintiffs attempt to distinguish the rule announced in these cases and contend that no statute, rule of law, or commentary requires submission of the instant controversy to the Interstate Commerce Commission as a condition precedent to the intervention of a federal court of equity. They rely upon Prendergast v. N. Y. Tel. Co., 262 U. S. 43, 43 S. Ct. 466, 67 L. Ed. 853; Oklahoma Natural Gas Co. v. Russell, 261 U. S. 290, 43 S. Ct. 353, 67 L. Ed. 659; Pacific Tel. Co. v. Kuykendall, 265 U. S. 196, 44 S. Ct. 553, 68 L. Ed. 975; Turner, etc., Lumber Co. v. C., M. & St. P. Ry., 271 U. S. 259, 46 S. Ct. 530, 70 L. Ed. 934; Great Northern Ry. Co. v. Merchants' Elevator Co., 259 U. S. 285, 42 S. Ct. 477, 66 L. Ed. 943; Texas & Pacific Railway v. Gulf, etc., Ry., 270 U. S. 266, 46 S. Ct. 263, 70 L. Ed. 578; Board of R. R. Com'rs v. Great Northern Ry. Co., 281 U. S. 412, 50 S. Ct. 391, 74 L. Ed. 936.

Plaintiffs carry three strings to their bow. They argue that upon the making of the order in question the proceedings reached the stage which permitted them to resort to the court for relief inasmuch as there was no administrative question to be reviewed by the Interstate Commerce Commission; that all of defendant's cases are authority for the position that a court will not grant equitable relief if there still remains open to plaintiffs an administrative review of an administrative question. Plaintiffs' second position is based on section 9 of the act (49 USCA § 259). This section does not give them an absolute right to review the order of the Co-ordinator, but leaves it with the Commission to determine whether such review will be undertaken, and that in the meantime they will suffer irreparable damage. They finally contend (and this is their chief reliance) that the order was entirely beyond the au-

thority of the Co-ordinator (or for that matter, the Interstate Commerce Commission) to make, and, therefore, resort to a court of equity for injunctive relief at this stage of the proceedings is permissible.

We will discuss the first of plaintiffs' contentions rather briefly. Our conclusion is that, under the rule laid down in United States v. Illinois Central Railway, supra, plaintiffs are not excused from applying to the Interstate Commerce Commission because that body may deny their application and refuse to hear them on the merits of their petition.

In disposing of this contention we might observe that plaintiffs' right to apply to the Commission is clear. It is absolute and unqualified. No action of the Commission is necessary to permit them to make application for review of the Co-ordinator's order. The Co-ordinator may not prevent them from making application. The Commission, it is true, may, upon the presentation of the application, dismiss it, but in doing so the Commission must act. It must exercise its discretion. It is the *action* of the Commission that is essential. Whether the action be affirmative or negative is immaterial. The absolute right of plaintiffs to apply to the Commission and the latter's obligation to take action on the application make it necessary for the plaintiffs to apply first to the Commission before it applies to a court of equity for injunctive relief.

The first and third points may be considered together. Does the order involve an administrative matter? Is the Co-ordinator given authority by the act to make the order in question? We answer both questions in the affirmative.

The determination of the controversy which resulted in this order was essentially the determination of an administrative question. Refusal to permit one or more railroads carrying passengers from the north to the south to select their own connecting units involves many questions. Plaintiffs assert that the substitution of the New York Central Railroad for the Chicago & Eastern Illinois will result in improved service and a greater share of the winter touring traffic for their route. These are desirable and worthy objects.

. The elimination of the Chicago & Eastern Illinois as a link in this important chain of carriers, on the other hand, may be fatal to the existence of the Chicago & Eastern Illinois. It is involved in proceedings under section 77 of the Bankruptcy Act (11 USCA § 205) relating to reorganization of insolvent railroads. Its credit is impaired. It is laboring hard and is in financial distress. As a carrier of passengers going from Chicago to Florida and return, its elimination by the plaintiffs may and probably will sound the knell of its passenger business. The Chicago & Eastern Illinois runs through a rich and more populous country than the New York Central, so it is asserted. The destruction of its passenger traffic, at least its through passenger traffic, may so impair its revenues as to destroy or at least impair its ability to serve the coal industry from which it derives most of its revenue.

Whether service will be improved by the substitution of the New York Central for the Chicago & Eastern Illinois, whether such beneficial results would outweigh the injury which comes from the body blow delivered to the Chicago & Eastern Illinois, are matters which call for the determination of an intelligent and experienced administrative body. In short, the question is an administrative one.

This brings us to the final and vital question in the case, to wit, the power of the Co-ordinator to make the order under attack. We are assuming that he does not possess such power unless this act gives it. In determining the duties, authority, and powers of the Co-ordinator, we are satisfied that the act must be read as a whole and not merely looked at by sections. When we do so, we find its purposes are rather clear. The act was intended to relieve the existing national emergency in relation to interstate transportation. It obviously was intended to expedite relief measures and to more completely co-ordinate the duties of the representative of the Interstate Commerce Commission and the committee named by the railroads who represented the latter. Generally speaking, a study of it warrants the conclusion that it was enacted to save certain railroads from bankruptcy and to perpetuate an efficient means of interstate transportation in the United States. The condition of many roads was desperate. The duties of the Co-ordinator and the committee are set forth at length, but the express delegation of power is less fortunately expressed. It appears chiefly in sections 5 and 6 (a) of the act (49 USCA §§ 255, 256 (a).

The act, viewed as an entirety, appears to have been drawn so as to have the Co-ordinator as far as possible work with and through a committee, composed of representatives of the railroads, thereby obtaining the early cooperation and coaction of the interstate carriers. The powers and duties of both the committee and the Co-ordinator might have been stated more specifically. We, however, quote from section 4 of title 1 (49 USCA § 254), that we may better approach an analysis of sections 5 and 6 (a): "Sec. 4. The purposes of this chapter are (1) to encourage and promote or require action on the part of the carriers and of subsidiaries subject to chapter 1 of this title, which will (a) avoid unnecessary duplication of services and facilities of whatsoever nature and permit the joint use of terminals and trackage incident thereto or requisite to such joint use: Provided, That no routes now existing shall be eliminated except with the consent of all participating lines or upon order of the Coordinator, (b) control allowances, accessorial services and the charges therefor, and other practices affecting service or operation, to the end that undue impairment of net earnings may be prevented, and (c) avoid other wastes and preventable expense; (2) to promote financial reorganization of the carriers, with due regard to legal rights, so as to reduce fixed charges to the extent required by the public interest and improve carrier credit; and (3) to provide for the immediate study of other means of improving conditions surrounding transportation in all its forms and the preparation of plans therefor."

The extent to which the Congress was willing to go to assist the carriers is also shown by section 10 (a) of the act (49 USCA § 260 (a), which relieved the carriers from the operation of the anti-trust laws (15 USCA § 1 et seq.) and by section 8 (49 USCA § 258) which suspended the existing prohibitions against pooling.

In short, the act was to administer oxygen to critical patients and to revive those who were suffering from sinking spells. Its tone forbids the conclusion that the strong carriers might exterminate the weaker competitor. Rather was it the announced policy of the Government to render assistance to all carriers and keep their heads above water until calmer times appeared.

Plaintiffs first argue that the Co-ordinator was not permitted to act excepting in case the committee failed to act. Reliance is upon the language of section 6 (a) (49 USCA § 256 (a): "If, in any instance, a committee has not acted with respect to any matter which the Coordinator has brought to its attention and upon which he is of the opinion that it should have acted, under the provisions of section 5, he is hereby authorized and directed to issue and enforce such order * * *."

The Co-ordinator in his order made a finding (subsection 3 above set forth) to the effect that the committees "have not acted with respect to the matter which the Coordinator brought to the attention of said committees." If this finding be sustained, then the first ground for plaintiffs' objection falls. Plaintiffs, however, say that the facts reported by the Co-ordinator show this statement to be a conclusion and that the said regional co-ordinating committees did in fact act. With this position, however, we cannot agree. The matter was referred to the committees by the Co-ordinator. The committees made a report wherein they expressed their opinion to the effect that plaintiffs had a right to substitute the New York Central for the Chicago & Eastern Illinois; that advantages to the Chicago-Florida service would accrue from such substitution; that no material expenditures would be necessary; and that it was not interested in the effect such a substitution would have upon the Chicago & Eastern Illinois.

Did this constitute action such as is referred to in section 6 (a) of the act?

There is no question but that members of the committees being experienced railroad men were entitled to their own judgment. Their individual and collective opinions were entitled to consideration and respect. It was not to be expected that they could or should act to carry out the wishes or directions of the Co-ordinator, if contrary to their best judgment. If, as lawyers or upon the advice of lawyers, they believed that plaintiffs had the legal right to drop the Chicago & Eastern Illinois as one link in the through passenger chain, they were not expected to act contrary to such opinion. However, their nonaction, which was in substance a refusal to proceed, whatever the reason, can hardly be said to constitute action. If the committees believed that the proposed action of the Co-ordinator was in excess of his authority, they might well refuse to co-op-

erate. However, they can hardly say later on that they acted.

Likewise, we are not satisfied that the nonaction, to which reference is made in section 6 (a), denied to the Co-ordinator authority to make appropriate directions under section 5.

■ *In brief, it is our conclusion that the authority of the Co-ordinator is not limited to those matters wherein his judgment coincides with that of the committees.*

■ It is next contended by plaintiffs that the Co-ordinator's order is void because he failed to give them a hearing. Neither the Co-ordinator nor the committees had any public hearings. No testimony was taken by either. Nor was it necessary that such hearings be held or that witnesses be sworn and cross-examinations had. This was a hearing and a determination of an administrative question by an administrative officer. The rules which govern the trial of cases were therefore not applicable.

■ Nor can we say that the order which is here under review is outside the scope of the Co-ordinator's authority. If we were to confine our study to a single sentence of a single section (an unauthorized course), we would say the last clause of section 5 and the last sentence of section 6 (a) supply the authority. However, the scope of the Co-ordinator's authority is to be determined largely by his duties. To illustrate: Section 8 (49 USCA § 258) does not expressly confer upon the Co-ordinator any authority to enter an order respecting pooling arrangements. Yet this section, speaking of the contents of the order, provides: "and such order may include provision for the creation and administration of such just pooling arrangements. * * *" This act places no restraint on the kinds of pooling agreements that may be created and administered, save that they be just and "necessary or desirable" and in furtherance of the purposes of the act.

The purposes of the act, as heretofore quoted, appear in section 4. One was to avoid all unnecessary duplication of services and facilities of whatsoever nature and permit the joint use of terminals and trackage incidental thereto or requisite to such joint use. Another purpose was to avoid other wastes and preventable expense.

In this section there occurs this statement: "Provided, That no *routes now existing* shall be eliminated *except* with the consent of all participating lines or *upon order of the Coordinator."* Nowhere do we find authority for the Co-ordinator to eliminate an existing route, and yet here, inferentially, such authority is recognized.

The Co-ordinator found that the substitution of the New York Central for the Chicago & Eastern Illinois would result in unnecessary duplication of services and facilities and the elimination of a *route now existing* without the consent of all participating lines and would unduly impair the net earnings of the Chicago & Eastern Illinois. We are unable to say such finding is not supported by the facts. A full hearing before the Interstate Commerce Commission may demonstrate that it is unsound, but plaintiffs have not seen fit to apply to the Interstate Commerce Commission. We are not prepared to say that such substitution will not result in the elimination of a "route now existing." True, the Chicago & Eastern Illinois railroad tracks will still exist. Trains may run over them. Passengers leaving Chicago may get off at Evansville, Indiana, and, by changing baggage and hiring taxicab service, make the Dixie Flyer, etc. Practically, however, it may mean extinction of the existing Chicago & Eastern Illinois *route* and surely it will eliminate the Chicago & Eastern Illinois as a unit in the Dixie Limited chain.

■ Considering the purpose of this act which is clearly remedial in character, and should be construed accordingly, we do not feel justified in holding that the Co-ordinator acted outside the scope of the authority given him by this statute. It follows from this conclusion that the plaintiffs should have applied to the Interstate Commerce Commission for relief before applying to a court of equity for injunctive relief.

It follows, therefore, that the complaint must be dismissed.