TEXAS ᴇᴛ ᴀʟ. *v.* UNITED STATES ᴇᴛ ᴀʟ.

No. 920.   Argued May 9, 1934.—Decided June 4, 1934.

*Mr. A. R. Stout,* Assistant Attorney General of Texas, with whom *Mr. James V. Allred,* Attorney General, *Mr. Elbert Hooper,* Assistant Attorney General, and *Mr. Elmer L. Lincoln* were on the brief, for appellants.

*Assistant Attorney General Stephens,* with whom *Solicitor General Biggs* and *Messrs. Carl McFarland, Ashley Sellers, Daniel W. Knowlton,* and *E. M. Reidy* were on the brief, for the United States and Interstate Commerce Commission, appellees.

*Mr. Samuel W. Moore,* with whom *Messrs. Frank H. Moore* and *Cyrus Crane* were on the brief, for the Kansas City Southern Ry. Co. et al., appellees.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

The Interstate Commerce Commission, by its report and order of October 4, 1933, authorized the Kansas City Southern Railway Company, a corporation organized under the laws of Missouri, to acquire control by lease of the railroad and properties of the Texarkana & Fort Smith Railway Company, incorporated under the laws of Texas. 193 I.C.C. 521. In this suit, the State of Texas, and officers and municipalities of that State, assailed the order as transcending the authority granted to the Commission by the Congress. The order was sustained by the District Court, 6 F.Supp. 63, three judges sitting as required by statute, and from its decree this appeal is taken.

The single point in controversy is with respect to the authority of the Commission to approve the acquisition of control by a lease which permits the lessee to abandon, or to remove from the State, the general offices, shops, etc., of the lessor. The provision of § 5 of the lease, which has that effect, is set forth in the margin.[1] The provi-

---

[1] " But the Southern Company (applicant) does not assume the performance of any corporate obligations on the part of the Texarkana Company independent of its obligations as a common carrier. The Southern Company does not assume any obligation to maintain, during the term of this lease, any general offices, machine shops or roundhouses for or belonging to the Texarkana Company at any particular place or places, regardless of present or previous locations thereof; but shall have the right to change any existing location of general offices, machine shops, roundhouses and terminal facilities, belonging to the Texarkana Company, and to relocate the same, and, from time to time, to change the same, during the full term of this lease, and shall have the right to make all such locations, changes and alterations as in the judgment of the Southern Company will enable it to operate the demised premises in the public interest and with the greatest economy and efficiency; and the Southern Company shall not be obligated or bound to perform any contractual,

sion is attacked as being in violation of the laws of Texas, which confine to Texas corporations the right to "own or maintain any railways" within the State, which require every railroad company chartered by the State to "keep and maintain permanently its general offices within this State at the place named in its charter," and at that place also to maintain the offices of its principal officers, and which prohibit any railroad company from changing "the location of its general offices, machine shops, or roundhouses, save with the consent and approval of the Railroad Commission" of the State.[2]

statutory, or other obligations with reference to such matters which may now or hereafter rest upon the Texarkana Company; and any and all such changes may be made, from time to time, by the Southern Company as may be approved by the judgment of its officers or Board of Directors."

[2] These provisions of the Revised Civil Statutes of Texas, 1925, are as follows:

Art. 6260. "No corporation, except one chartered under the laws of Texas, shall be authorized or permitted to construct, build, operate, acquire, own or maintain any railways within State."

Art. 6275. "Every railroad company chartered by this State, or owning or operating any line of railway within this State, shall keep and maintain permanently its general offices within this State at the place named in its charter for the location of its general offices. If no certain place is named in its charter where its general offices shall be located and maintained, then said railroad company shall keep and maintain its general offices at such place within this State where it contracts or agrees to locate its general office for a valuable consideration."

Art. 6278. "Railroad companies shall keep and maintain at the place within this State where its general offices are located the office of its president, or vice-president, secretary, treasurer, local treasurer, auditor, general freight agent, traffic manager, general manager, general superintendent, general passenger and ticket agent, chief engineer, superintendent of motive power and machinery, master mechanic, master of transportation, fuel agent, general claim agent; and each one of its general offices shall be so kept and

The Interstate Commerce Commission was divided in opinion. Upon a prior hearing, the Commission approved the lease upon the condition that the paragraph in controversy should be eliminated. Report and order of December 27, 1932; 189 I.C.C. 253. Following the enactment of the Emergency Railroad Transportation Act, 1933 (Act of June 16, 1933, c. 91), the proceeding was reopened and, after hearing, the Commission modified its order by striking out the above-mentioned condition, thus approving and authorizing the lease with its provision, in § 5, as to offices and shops.

The findings of fact set forth in the Commission's report are not contested. The lines which constitute what is called the Kansas City Southern Railway system (embracing the portions covered by the proposed lease) extend from Kansas City, Missouri, to Port Arthur, Texas (over 800 miles). The line of the Kansas City Southern Railway Company, the applicant, extends from Kansas City, Missouri, to Mena, Arkansas. The line of the Texarkana & Fort Smith Railway Company is in two segments. The northern segment extends from Mena in a southerly direction, crosses the Arkansas-Texas State line, and runs through Texarkana and thence southeasterly into Arkansas and to the Arkansas-Louisiana State line.

---

maintained by whatever name it is known, and the persons who perform the duties of said general offices, by whatever name known, shall keep and maintain their offices at the place where said general offices are required to be located and maintained; and the persons holding said general offices shall reside at the place and keep and maintain their offices at the place where said general offices are required by law to be kept and maintained. . . ."

Art. 6286. "No railroad company shall change the location of its general offices, machine shops or roundhouses, save with the consent and approval of the Railroad Commission of Texas, and this shall apply also to receivers and to purchasers of the franchises and properties of railroad companies and to new corporations formed by such purchasers or their assigns. . . ."

The portions of this segment in Arkansas are operated by the applicant under a lease previously authorized by the Interstate Commerce Commission. 105 I.C.C. 523. The portion of the northern segment which lies in the State of Texas, is approximately 31 miles in length. The southern segment of the Texarkana & Fort Smith Railway extends from the Louisiana-Texas State line at the Sabine River to Port Arthur, Texas, and is approximately 50 miles in length. Thus, the total main line mileage of the Texarkana & Fort Smith Railway in Texas is 81 miles; there are about 18 miles of branch lines. The portion of the railroad system lying between the Arkansas-Louisiana State line and the Louisiana-Texas State line, approximately 228 miles, is owned by the Kansas City, Shreveport & Gulf Railroad Company, a subsidiary of the applicant.

The Commission, on the first hearing, found that the consummation of the plan presented by the applicant would result in an annual saving, under normal conditions, of about $81,000. This finding was repeated in the final report. The estimated saving would result from the unification of operations, the discontinuance of general offices of the Texarkana & Fort Smith Railway Company at Texarkana, and the removal to Shreveport and Kansas City of many of the activities at Texarkana which caused duplication of work. Thus, under the proposed plan, the auditor's and treasurer's departments of the Texarkana & Fort Smith Railway Company would be transferred to the applicant's headquarters at Kansas City, with an estimated annual saving of over $57,000. The offices of the general freight agent, general passenger agent, superintendent, and division engineer, and of the master mechanic at Port Arthur, would be removed to Shreveport and consolidated with similar offices of the applicant, at an estimated annual saving of over $21,000. There would also be a decrease in expenses for various services in connection with the building at Texarkana.

Shreveport, said the Commission, is considered to be more centrally located from an operating standpoint than Texarkana, and there are at that point the applicant's main terminal for the southern territory, shops for heavy repairs, more industry, greater population, and more railroad connections.

The Commission found that for the four years, 1928–1931, the Texarkana & Fort Smith Railway Company handled an average of 993,622 tons of intrastate traffic and 3,405,944 tons of interstate traffic. Of the average total of 4,399,566 tons, the applicant participated in the handling of 3,192,554 tons. The net income of the Texarkana & Fort Smith Railway Company amounted to $441,922 in 1926, $204,052 in 1927, $437,270 in 1928, $598,172 in 1929, and $95,655 in 1930. In 1931 there appears to have been no net income. The Commission concluded that "in view of the volume of interstate traffic handled by the T. & F. S. and the net income earned by that carrier, it is clear that the expenditure of approximately $81,000 a year, which will be unnecessary under the plan that the applicant proposes to put into effect under the lease, constitutes an undue burden upon interstate commerce."

The Commission further found "that the lease by the Kansas City Southern Railway Company of the railroad and properties of the Texarkana & Fort Smith Railway Company, located in Texas and elsewhere not now under lease, in accordance with the proposed lease, will be in harmony with and in furtherance of the plan for the consolidation of railroad properties heretofore established by us and will promote the public interest."

The State of Texas raises no question as to the constitutional power of the Congress to confer authority upon the Commission to approve the proposed lease with the stipulations under consideration. The question is simply as to the scope of the authority which has been con-

ferred,—the construction of the applicable statutory provisions. These are found in § 5 of the Interstate Commerce Act as amended by the Emergency Railroad Transportation Act, 1933 (Title II, §§ 201, 202). Paragraphs (4) (a) and (4) (b) of that section make it lawful, with the approval and authorization of the Commission, for two or more carriers to consolidate or merge their properties; " or for any carrier . . . to purchase, lease, or contract to operate the properties, or any part thereof, of another," or to acquire control of another through purchase of its stock. On application to the Commission for such approval, appropriate notice of public hearing must be given to the Governor of each State in which any part of the properties of the carriers involved is situated, as well as to the carriers themselves. If after hearing " the Commission finds that, subject to such terms and conditions and such modifications as it shall find to be just and reasonable, the proposed consolidation, merger, purchase, lease, operating contract, or acquisition of control will be in harmony with and in furtherance of the plan for the consolidation of railway properties established pursuant to paragraph (3), and will promote the public interest," the Commission may give its approval and authorization accordingly.[3]

---

[3] The full text of paragraphs (4) (a) and (4) (b) is as follows:

"(4) (a). It shall be lawful, with the approval and authorization of the Commission, as provided in subdivision (b), for two or more carriers to consolidate or merge their properties, or any part thereof, into one corporation for the ownership, management, and operation of the properties theretofore in separate ownership; or for any carrier, or two or more carriers jointly, to purchase, lease, or contract to operate the properties, or any part thereof, of another; or for any carrier, or two or more carriers jointly, to acquire control of another through purchase of its stock; or for a corporation which is not a carrier to acquire control of two or more carriers through ownership of their stock; or for a corporation which is not a carrier

These broadening provisions of the Emergency Railroad Transportation Act, 1933, confirm and carry forward the purpose which led to the enactment of Transportation Act, 1920, (Title IV, 41 Stat. 474, *et seq.*). We found that Transportation Act, 1920, introduced into the federal legislation a new railroad policy, seeking to insure an adequate transportation service. To attain that end, new rights, new obligations, new machinery, were created. *Railroad Commission of Wisconsin* v. *Chicago, B. & Q. R. Co.,* 257 U.S. 563, 585; *New England Divisions Case,* 261 U.S. 184, 189, 190; *Dayton-Goose Creek Ry. Co.* v. *United States,* 263 U.S. 456, 478. It is a primary aim of that policy to secure the avoidance of waste. That avoidance, as well as the maintenance of service, is viewed as a direct concern of the public. *Davis* v. *Farmers Co-operative Co.,* 262 U.S. 312, 317; *Texas & Pacific Ry. Co.* v. *Gulf, C. & S. F. Ry. Co.,* 270 U.S. 266, 277. The authority given to the Commission to authorize consolidations, purchases,

---

and which has control of one or more carriers to acquire control of another carrier through ownership of its stock.

"(b). Whenever a consolidation, merger, purchase, lease, operating contract, or acquisition of control is proposed under subdivision (a), the carrier or carriers or corporation seeking authority therefor shall present an application to the Commission, and thereupon the Commission shall notify the Governor of each State in which any part of the properties of the carriers involved in the proposed transaction is situated, and also such carriers and the applicant or applicants, of the time and place for a public hearing. If after such hearing the Commission finds that, subject to such terms and conditions and such modifications as it shall find to be just and reasonable, the proposed consolidation, merger, purchase, lease, operating contract, or acquisition of control will be in harmony with and in furtherance of the plan for the consolidation of railway properties established pursuant to paragraph (3), and will promote the public interest, it may enter an order approving and authorizing such consolidation, merger, purchase, lease, operating contract, or acquisition of control, upon the terms and conditions and with the modifications so found to be just and reasonable."

leases, operating contracts, and acquisition of control, was given in aid of that policy. *New York Central Securities Corp.* v. *United States*, 287 U.S. 12, 24, 25. The criterion to be applied by the Commission in the exercise of its authority to approve such transactions—a criterion reaffirmed by the amendments of Emergency Railroad Transportation Act, 1933—is that of the controlling public interest. And that term as used in the statute is not a mere general reference to public welfare, but, as shown by the context and purpose of the Act, " has direct relation to adequacy of transportation service, to its essential conditions of economy and efficiency, and to appropriate provision and best use of transportation facilities." *New York Central Securities Corp.* v. *United States, supra.*

It is in the light of this criterion that we must consider the scope of the Commission's authority in relation to provisions which are intended to relieve interstate carriers from burdensome outlays. The fact that burdensome expenditures may be required by state regulations is not a barrier to their removal by dominant federal authority in the protection of interstate commerce. As we said in *Colorado* v. *United States*, 271 U.S. 153, 163: " Prejudice to interstate commerce may be effected in many ways. One way is by excessive expenditures from the common fund in the local interest, thereby lessening the ability of the carrier properly to serve interstate commerce." Even explicit charter provisions must yield to the paramount regulatory power of the Congress. *New York* v. *United States*, 257 U.S. 591, 601. Obligations assumed by the corporation under its charter of providing intrastate service are subordinate to the performance by it of its federal duty, also assumed, " efficiently to render transportation services in interstate commerce." *Colorado* v. *United States, supra*, p. 165. See *Transit Commission* v. *United States*, 284 U.S. 360, 367, 368; *Transit Commission* v. *United States*, 289 U.S. 121, 127; *Florida* v. *United States*,

*ante,* p. 1. In the present case, the findings of the Commission, setting forth undisputed facts, leave no doubt that the provision of the lease permitting the abandonment, or removal from the State, of general offices and shops of the lessor has direct relation to economy and efficiency in interstate operations and to the achievement of the purpose which the Congress had in view in its grant of authority.

Counsel for the United States and for the Interstate Commerce Commission emphasize the limitations of the challenged provision. They point out that, in addition to the customary " general offices " of railroads, § 3, of Article X, of the Constitution of Texas provides that railroad corporations must " maintain a public office or place in this State for the transaction of its business, where transfers of stock shall be made, and where shall be kept for inspection by the stockholders of such corporations, books," in which shall be recorded the amount of capital stock subscribed, the names of stockholders, etc., and transfers, the amount of its assets and liabilities, and the names and places of residence of its officers. See, also, Art. 4115, Texas Revised Statutes, 1879; Laws of Texas, 1885, c. 68; Arts. 1358, 6281, Revised Civil Statutes of Texas, 1925. Counsel for the United States and for the Interstate Commerce Commission urge that the " Office-Shops Act," here involved, was enacted independently of the above statutes. Laws of Texas, 1889, c. 106; Art. 6275, Revised Civil Statutes of Texas, 1925. Accordingly, they insist that the order of the Commission and the lease in question apply to the " general offices," shops, etc., and not to the " public office " of the domestic corporation. Counsel for the applicant, the Kansas City Southern Railway Company, submits that the lease by necessary implication requires the Texarkana & Fort Smith Railway Company to maintain its principal office

in Texas as the Texas statute requires. See as to service of process, Art. 2029, Revised Civil Statutes of Texas, 1925. In view of the disclaimer on behalf of the United States and the Interstate Commerce Commission, and the interpretation placed upon the provision in the lease, we assume that the question before us merely relates to the abandonment or removal of "general offices," shops, etc., as distinguished from the "public office" required by the Texas statutes, that is, to those transportation facilities the continued maintenance of which, in the circumstances described by the findings of the Commission, would entail unnecessary and burdensome expenditures in operation. As thus construed, we find no ground for concluding that the approval of the provision in the lease was beyond the Commission's authority. There is no interference with the supervision of the State over the lessor in matters essentially of state concern, as distinguished from the operations which in their effect upon interstate commerce are of national concern.

The State invokes § 11 of Title I of the Emergency Railroad Transportation Act, 1933, which provides that "Nothing in this title shall be construed to relieve any carrier from any contractual obligation which it may have assumed, prior to the enactment of this Act, with regard to the location or maintenance of offices, shops, or roundhouses at any point." But that section refers explicitly to what is contained in Title I of the Act, with respect to "emergency powers," dealing with the authority of the Federal Coördinator of Transportation and kindred matters, and does not by its terms apply to the provisions of Title II of the Act, in which are found the amendments of § 5 of the Interstate Commerce Act with respect to the approval and authorization by the Interstate Commerce Commission of consolidations, purchases and leases. And § 11 of Title I relates to "contractual obligations" assumed by the carrier and does not aptly refer to obli-

gations imposed by statute.[4] The insertion of the provision in Title I, with its restricted application, and the omission of a similar provision from Title II, indicate an intentional distinction.

Title II of the Emergency Railroad Transportation Act, 1933, in amending § 5 of the Interstate Commerce Act, carries its own provision as to immunity from state requirements which would stand in the way of the execution of the policy of the Congress through the Commission's orders. Subdivision (15) of § 5 as amended, reads: [5]

" The carriers and any corporation affected by any order under the foregoing provisions of this section shall be, and they are hereby, relieved from the operation of the antitrust laws as designated in section 1 of the Act entitled 'An Act to supplement existing laws against unlawful restraints and monopolies, and for other purposes,' approved October 15, 1914, and of all other restraints or prohibitions by or imposed under authority of law, State or Federal, insofar as may be necessary to enable them to do anything authorized or required by such order."

The view that, by reference to the context, this immunity should be regarded as limited to those " restraints or prohibitions by or imposed under authority of law " which fall within the general description of " anti-trust " legislation, is too narrow. The rule of " *ejusdem generis* " is applied as an aid in ascertaining the intention of the legislature, not to subvert it when ascertained. *Mid-Northern Oil Co.* v. *Montana,* 268 U.S. 45, 49. The scope of the immunity must be measured by the purpose which Congress had in view and had constitutional power to accomplish. As that purpose involved the promotion of economy and efficiency in interstate transportation by the

---

[4] See Cong. Rec., 73d Cong., 1st sess., Vol. 77, Pt. 5, p. 4439.

[5] Compare subdivision (8) of § 5 of the Interstate Commerce Act as amended by Transportation Act, 1920.

removal of the burdens of excessive expenditure, the removal of such burdens when imposed by state requirements was an essential part of the plan. The State urges that in the course of the passage of Transportation Act, 1920, a provision for federal incorporation of railroads was struck out. But while railroad corporations were left under state charters, they were still instrumentalities of interstate commerce, and, as such, were subjected to the paramount federal obligation to render the efficient and economical service required in the maintenance of an adequate system of interstate transportation. *Colorado* v. *United States, supra.*

The decision in *International & Great Northern Ry. Co.* v. *Anderson County*, 246 U.S. 424, is not opposed. Apart from the fact that in that case the state court had found, upon the verdict of a jury, that the maintenance of the offices and shops at the place at which the predecessor of the plaintiff in error had contracted to maintain them, did not impose a burden upon interstate commerce—a finding which this Court found no reason to disturb (*Id.*, pp. 433, 434)—the case arose prior to the enactment of Transportation Act, 1920, and the question here presented was not involved.

The decree dismissing the bill of complaint is affirmed.

*Decree affirmed.*