## ATLANTIC COAST LINE R. CO. v. HAMPTON & BRANCHVILLE R. CO.

### No. 3947.

Circuit Court of Appeals, Fourth Circuit.

Jan. 6, 1936.

Fitzgerald Hall, of Nashville, Tenn. (Carl H. Davis, of Wilmington, N. C., Arthur R. Young, of Charleston, S. C., and W. A. Townes, of Wilmington, N. C., on the brief), for appellant.

Randolph Murdaugh, of Hampton, S. C., for appellee.

Before NORTHCOTT and SOPER, Circuit Judges, and COLEMAN, District Judge.

SOPER, Circuit Judge.

The Hampton & Branchville Railroad Company filed a bill in equity in the District Court against the Atlantic Coast Line Railroad Company, hereinafter called the Coast Line, and Charleston & Western Carolina Railway Company, hereinafter called the C. & W. C., to enjoin the application of a tariff filed by the Coast Line with the Interstate Commerce Commission affecting certain interstate rates. Answers were filed by the defendants and the case being heard on the pleadings, it was decreed that the injunction should issue. The Coast Line appealed.

The Hampton Railroad is a short line railroad of 48 miles extending in an easterly direction from Hampton, S. C., to Hampton and Branchville Junction, a distance of 16 miles, and thence to Cottageville, S. C., a distance of 32 miles. It connects with the C. & W. C. at Hampton, and with the Coast Line at Hampton and Branchville Junction. The distance of 16 miles between Hampton and Hampton and

Branchville Junction is that part of the line especially affected by the proposed tariff.

The Coast Line is a trunk line railroad which extends southerly along the Atlantic Seaboard between Richmond, Charleston, Savannah, Jacksonville, and points further south; and westerly, partly over its own rails and partly over the rails of other lines which it controls, it reaches Atlanta, Birmingham, and Montgomery. The C. & W. C. runs in a northwesterly direction from Hampton to Augusta and in a southeasterly direction from Hampton to Yemassee on the Coast Line. The Georgia Railroad runs in a westerly direction from Augusta to Atlanta. The three railroads, the Coast Line, the C. & W. C. and the Georgia are under a common management or control within the meaning of sections 1 (1) (a) and 15 (4) of the Interstate Commerce Act, as amended (49 U.S.C.A. §§ 1 (1) (a), 15 (4). See Georgia & Florida R. R. v. Atlantic Coast Line R. R. Co., 191 I.C.C. 489, 497.

Since July 5, 1931, the parties have acted as common carriers in moving freight, especially carloads of iron and steel articles, from Birmingham, Atlanta and Knoxville, via Hampton and Branchville Junction to Hampton, under joint through rates recognized and approved by the Interstate Commerce Commission. On January 31, 1935, the Coast Line filed certain supplementary tariffs effective March 16, 1935, whereby certain of these rates were eliminated. The changes made in the routing provisions of the tariff did not deprive the Hampton Railroad of participation in shipments from the affected origins to Hampton on combination rates, but these rates were higher than the former joint rates and higher than the joint rates via other routes. The practical effect was the elimination of the Hampton Railroad as a participant in the described shipments.

The change was made by the Coast Line to secure greater efficiency and economy in transportation by the elimination of joint rates applicable to circuitous routes under the former tariffs. For example, a shipment of iron from Atlanta, Ga., to Hampton, S. C., moves a total distance of 242 miles if routed by the short route via Augusta over the Georgia Railroad and the C. & W. C. The former tariffs provided joint through rates at the same cost as this short route for a movement of 509 miles between the same terminii over the Southern Railway from Atlanta via Spartanburg to Columbia, thence over the Coast Line to Hampton and Branchville Junction, via Sumter, Lanes, Charleston and Green Pond, and thence 16 miles via the Hampton Railroad to Hampton; or such a shipment might move under the former tariffs from Atlanta to Waycross over the A. B. & C. Railroad, thence over the Coast Line via Savannah and Green Pond to Hampton and Branchville Junction, thence over the Hampton Railroad to Hampton, a total distance of 495 miles.

On March 1, 1935, the Hampton Railroad requested the Interstate Commerce Commission, pursuant to the authority granted it under section 15 (7) of the Interstate Commerce Act, as amended (49 U.S.C.A. § 15 (7), to suspend the effective date of the new tariff and to enter upon a hearing concerning the lawfulness of the proposed rates. The Hampton Railroad contended that the combination rates over the routes in question were unreasonable, and in addition that the action of the Coast Line in closing the joint routes was unlawful in that it did not first obtain the consent of the Hampton Railroad. The Coast Line and the C. & W. C. filed answers to the petition, and the commission, without approving the tariff, declined to suspend it. The Hampton Railroad did not institute further proceedings to test the matter before the Interstate Commerce Commission under section 13 of the Interstate Commerce Act as amended, 49 U.S. C.A. § 13, but instead it filed the bill of complaint in the pending case challenging the validity of the tariff on the ground that certain joint routes were being closed without the consent of all the participating carriers or the consent of the Federal Coordinator of Transportation, as provided in the Emergency Railroad Transportation Act of June 16, 1933, 48 Stat. 211, 49 U.S. C.A. §§ 250–267. It relied in this respect upon the following proviso in section 4, title 1 of the act (49 U.S.C.A. § 254): "Provided, That no routes now existing shall be eliminated except with the consent of all participating lines or upon order of the Coordinator." The District Judge sustained this contention and adopted as its own the opinion of the Circuit Court of Appeals of the Fifth Circuit in Quanah, Acme & Pacific R. R. v. Panhandle & S. F. Ry., 67 F.(2d) 826.

The Emergency Railroad Transportation Act, 48 Stat. 211, as shown by its title, was enacted (1) to relieve the national emergency then existing in relation to in-

terstate railroad transportation, and (2) to amend sections 5, 15a and 19a of the Interstate Commerce Act. The Emergency Act consists of "Title I, Emergency Powers," and "Title II, Amendments to Interstate Commerce Act." Title 1 (49 U.S.C:A. §§ 250–257) created the office of Federal Coordinator of Transportation, in order to foster and protect interstate commerce in relation to railroad transportation by relieving the burdens resulting from the acute economic emergency, and in order to safeguard and maintain an adequate national system of transportation. Section 2 (49 U.S.C.A. § 252). The co-ordinator was directed to divide the lines of carriers into three groups, eastern, southern and western; and the carriers in each group were directed to select a regional co-ordinating committee consisting of seven members to represent it, no railroad system to have more than one representative on any such committee. Section 3 (49 U.S.C.A. § 253).

The purposes of title 1 were declared in section 4 (49 U.S.C.A. § 254) to be: "(1) to encourage and promote or require action on the part of the carriers and of subsidiaries subject to the Interstate Commerce Act, as amended [chapter 1 of this title], which will (a) avoid unnecessary duplication of services and facilities of whatsoever nature and permit the joint use of terminals and trackage incident thereto or requisite to such joint use: *Provided, that no routes now existing shall be eliminated except with the consent of all participating lines or upon order of the Coordinator*, (b) control allowances, accessorial services and the charges therefor, and other practices affecting service or operation, to the end that undue impairment of net earnings may be prevented, and (c) avoid other wastes and preventable expense; (2) to promote financial reorganization of the carriers, with due regard to legal rights, so as to reduce fixed charges to the extent required by the public interest and to improve carrier credit; and (3) to provide for the immediate study of other means of improving conditions surrounding transportation in all its forms and the preparation of plans therefor." (Italics inserted.)

The committees were directed on their own initiative to carry out the purposes set forth in section 4 (1) (49 U.S.C.A. § 254 (1), so far as such action could be voluntarily accomplished by the carriers; and if they should be unable to do so for any reason, they were directed to recommend to the co-ordinator that he give them appropriate directions by order subject to the Interstate Commerce Act as amended, and the co-ordinator was authorized and directed to issue and enforce such orders if he should find them consistent with the public interest and the purposes of the act (section 5 [49 U.S.C.A. § 255]). If in any instance a committee should not act with respect to any matter brought to its attention by the co-ordinator, he was authorized and directed to issue and enforce such order, subject to the Interstate Commerce Act as amended, as he should find to be consistent with the public interest. Section 6 (49 U.S.C.A. § 256).

It was further provided that any order issued by the co-ordinator should be made public and should remain in effect until vacated by him or suspended or set aside by the commission or other lawful authority (section 8 [49 U.S.C.A. § 258]); and any interested party dissatisfied with any order of the co-ordinator might file a petition with the commission asking that it be reviewed and suspended during such review, and the commission was given power in its discretion to grant the review and suspend the order, and after due notice and public hearing to take such action with respect thereto in accord with the purposes of the act as it should find to be consistent with the public interest. Section 9 (49 U.S.C.A. § 259). A willful failure or refusal of any carrier to comply with the terms of any order of the co-ordinator or of the commission was made a misdemeanor punishable by fine. Section 12 (49 U.S.C.A. § 262).

It was further made the duty of the co-ordinator to investigate and consider means of improving transportation conditions throughout the country, and from time to time to submit to the commission such recommendations calling for further legislation to these ends as he might deem necessary or desirable. Section 13 (49 U.S.C.A. § 263).

It was provided that title 1 should cease to have effect at the end of one year after the effective date, unless extended by the proclamation of the President, but orders of the co-ordinator or of the commission thereunder should continue in effect until vacated by the Commission or set aside by other lawful authority. Section 17 (49 U.S.C.A. § 267).

 The burden of the complaint is that the Coast Line undertook to eliminate a

joint rate without the consent of all the participating carriers, thereby ignoring the prohibition of the quoted proviso; and it is contended that this action was illegal, although the new tariff was duly filed and published as provided by section 6 of the Interstate Commerce Act, as amended (49 U.S.C.A. § 6), and the commission refused to suspend it when petitioned to do so by the Hampton Railroad under section 15 (7) of the act, as amended (49 U.S.C.A. § 15 (7). It would follow that these sections were amended by the proviso, or at least that their operation and effect were suspended during the period covered by the activities of the committees and the co-ordinator under the Emergency Act. We do not think that such a conclusion is justified. It will be observed that title 1 does not purport to abolish the Interstate Commerce Commission or to curtail its ordinary activities except in so far as they may be affected by the actions of the regional committees or the orders of the co-ordinator pursuant to the declared purposes of the act. On the contrary, the actions of the committees and of the co-ordinator must conform to the Interstate Commerce Act as amended, and the Interstate Commerce Commission is expressly authorized to review the orders of the co-ordinator upon the petition of any interested party. The committees and the co-ordinator are directed in sections 4, 5, and 6 (49 U.S. C.A. §§ 254–256) to take steps to avoid unnecessary duplication of services and facilities of whatsoever nature; but it is not provided that in the meantime the Interstate Commerce Commission shall cease to function or desist from the exercise of its powers over the rate structure of the carriers of the country. If such had been the intent of Congress, one would expect to find it expressed, if not in title 1 wherein the emergency powers are created, at least in title 2 where the amendments of the Interstate Commerce Act are set out. Title 2 (49 U.S.C.A. §§ 5, 15a, 19a); merely amends sections 5, 15a and 19a of the act. It does not change section 6 (1) of the Interstate Commerce Act, as amended (49 U.S.C.A. § 6 (1), which requires every common carrier by railroad to file its tariff of rates and charges with the commission, or section 6 (3), as amended (49 U.S.C.A. § 6 (3) which provides that no change shall be made in any rates or charges filed and published by a carrier except after 30 days' notice to the commission and to the public, or section 13 of the act, as amend-

ed (49 U.S.C.A. § 13), wherein it is provided that any common carrier complaining of anything done or omitted to be done by any common carrier in contravention of the provisions of the Interstate Commerce Act may file a petition with the commission for redress. Nor was any change made in section 15 (7) whereby the commission was given authority either upon complaint or upon its own initiative whenever a new rate should be filed, to enter upon a hearing in regard thereto, and pending such hearing to suspend the operation of the rate. We are not convinced by complainant's argument. It seems to us more reasonable to conclude that if Congress had intended to restrict the powers and duties of the commission it would have expressed its purpose in explicit terms, and would not have left it to be gathered from uncertain implication, especially as it expressly amended other sections of the Interstate Commerce Act by title 2 of the same enactment.

It follows that the Interstate Commerce Commission was the proper forum first to determine the question as to the reasonableness and legality of the new tariff, as provided in section 13 of the Interstate Commerce Act, and that until the Hampton Railroad had exhausted this administrative remedy, it had no right to resort to the courts. The applicable rule is thus stated in Great Northern Railway Co. v. Merchants' Elevator Co., 259 U.S. 285, 291, 42 S.Ct. 477, 479, 66 L.Ed. 943: "Whenever a rate, rule, or practice is attacked as unreasonable or as unjustly discriminatory, there must be preliminary resort to the Commission. Sometimes this is required because the function being exercised is in its nature administrative in contradistinction to judicial. But ordinarily the determining factor is not the character of the function, but the character of the controverted question and the nature of the enquiry necessary for its solution. To determine what rate, rule or practice shall be deemed reasonable for the future is a legislative or administrative function. To determine whether a shipper has in the past been wronged by the exaction of an unreasonable or discriminatory rate is a judicial function. Preliminary resort to the Commission is required alike in the two classes of cases. It is required because the enquiry is essentially one of fact and of discretion in technical matters; and uniformity can be secured only if its determination is left to the Commission. Moreover,

that determination is reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts of transportation is indispensable, and such acquaintance is commonly to be found only in a body of experts. But what construction shall be given to a railroad tariff presents ordinarily a question of law which does not differ in character from those presented when the construction of any other document is in dispute."

We are unable to follow the course adopted by the court in Quanah, Acme & Pacific R. R. Co. v. Panhandle & S. F. Ry. (C.C.A.) 67 F.(2d) 826, wherein the revocation by a carrier of a through interstate route and joint rate was enjoined because it was not done in accordance with the terms of the proviso. The court said (67 F.(2d) 826, page 828): "We think it clear that by the proviso the Congress in the exercise of its plenary power over interstate commerce did intend to adopt as proper to be maintained all the interstate routes which at the passage of the act had been lawfully established, and to prohibit their elimination by a carrier acting under section 6 (3) of the Commerce Act, unless all the participating carriers should consent or the co-ordinator should order it. The stability of existing routes thus to be secured might be of great aid to the co-ordinator and a much-needed safeguard to the traffic of the shorter lines during the adjustments contemplated by the new act. We are referred to some expressions of individual legislators in urging the adoption of the proviso as indicating that they thought it applied to the committees. Such expressions are no safe guide to the true meaning of a statute. Duplex Printing Press Co. v. Deering, 254 U.S. 443, 474, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196. The Congress evidently intended an effective prohibition, and that could not be secured by addressing it to a committee which had no power to do the prohibited thing while allowing it to be freely done by a carrier in pursuit of its own selfish ends. The proviso, so long as it is in force, must be taken as a modification of section 6 (3)."

It is also suggested by the court that the proviso could not have been addressed to the committees, because they were given no power to do anything save by the voluntary action of the carriers or by the order of the co-ordinator. But even if this be the meaning of section 5 of title 1 (49 U.S.C.A. § 255), the proviso serves as a warning to the committees, consisting of only seven members each, that they cannot initiate action looking toward the elimination of unnecessary facilities without the consent of all participating lines. It is placed, as we have seen, in the midst of section 4 (49 U.S.C.A. § 254) wherein the purposes for which the emergency powers described in title 1 are set forth; and these purposes the committees and the co-ordinator are required to carry out by the express terms of sections 5 and 6 (49 U.S.C.A. §§ 255, 256) immediately following. Indeed, as pointed out in Louisville & N. R. Co. v. U. S. (D.C.) 10 F.Supp. 185, 192, the powers and duties of the committees and of the co-ordinator do not clearly appear unless section 4 is read in connection with sections 5 and 6. We think that the proviso was inserted to make it quite clear that the rights of all carriers should be respected by the committees, rather than that it was loosely used to modify indirectly the powers of the Interstate Commerce Commission.

In Texas v. United States, 292 U.S. 522, 54 S.Ct. 819, 78 L.Ed. 1402, the Supreme Court held that section 11 of title 1 of the Emergency Act (49 U.S.C.A. § 261), providing that nothing in that title should be construed to relieve any carrier of any contractual obligation theretofore assumed with regard to the location or maintenance of offices, shops or roundhouses at any point, was not inconsistent with the power of the Interstate Commerce Commission under section 5 of the Interstate Commerce Act, as amended in title 2 of the Emergency Act (49 U.S.C.A. § 5), to relieve from like obligations imposed by state statute, because section 11 (49 U.S.C.A. § 261) explicitly refers to what is contained in title 1 of the act and by its terms does not apply to the provisions of title 2. We think it is equally clear that the proviso in section 4 of title 1 of the act (49 U.S.C.A. § 254) was intended to relate to the subject-matter of that title, and did not effect a curtailment of the powers or duties conferred on the Interstate Commerce Commission by sections 6 (1), 6 (3), 13 (1) and 15 (7) of the Interstate Commerce Act, as amended (49 U.S.C.A. §§ 6 (1,3), 13 (1), 15 (7). See, also, Florida v. United States, 292 U.S. 1, 5, 6, 54 S.Ct. 603, 78 L.Ed. 1077.

The decree of the District Court is reversed, and the case remanded, with directions to dismiss the bill of complaint.

Reversed and remanded.