**SOUTHERN RAILWAY COMPANY et al., Plaintiffs,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

No. 7954.

United States District Court
E. D. Louisiana,
New Orleans Division.

Sept. 2, 1958.

James A. Bistline, Washington, D. C., for plaintiffs.

Ernest D. Grinnell, Jr., St. Louis, Mo., for intervening Railroad defendants.

Nuel D. Belnap, Chicago, Ill., for L. T. Barranger & Co.

John C. Danielson, Washington, D. C., for the United States.

B. Franklin Taylor, Jr., Washington, D. C., for the Interstate Commerce Commission.

Before WISDOM, Circuit Judge, and WRIGHT and DAWKINS, District Judges.

J. SKELLY WRIGHT, District Judge.

In this action, the Southern Railway System lines, hereafter called "Southern," seek to have set aside the report and order of the Interstate Commerce Commission in Docket No. I. & S. 6588, Cotton From the Southwest to Southern Territory, 302 I.C.C. 637.[1] That order directed Southern to cancel the restrictive routing provisions which Southern had included in the tariff schedules establishing reduced joint rates on cotton[2] moving from the southwest, across the Mississippi, to points in Southern Territory. These reduced rates had been agreed upon by the southwestern and southern rail carriers in order to meet motor truck competition. Southern, acting unilaterally, proposed to restrict the application of the lower rates to a limited number of the existing routes east of the Mississippi, chiefly to those routes which gave Southern its maximum haul. This action was protested by one cotton shipper and by a number of southern railroads[3] whose participation in the cotton traffic would have been reduced if the restrictive routing became effective. The Commission allowed the re-duced joint rates to go into effect on July 6, 1956, but suspended, and later cancelled, Southern's routing restrictions. The only issue in the present suit is whether the Commission's order of cancellation was, as Southern insists, "contrary to law, illegal and arbitrary."

A very large part of the cotton transported in the United States is grown in the southwest and moves across the Mississippi through five gateways, St. Louis, Memphis, Vicksburg, Natchez and New Orleans, to manufacturers in the southeast. From the farm the cotton goes to a compressor where it is sold to a cotton shipper. The shipper sends cotton from various origins to a warehousing point where it is graded, usually into 100-bale lots of even grade and staple. Thereafter it is shipped to southern mills according to market demand. Title passes to the manufacturer by negotiation of the bill of lading while the cotton is in transit. A majority of the manufacturers are located at destinations in Alabama, Georgia, South Carolina and North Carolina. The shippers' warehouses are found at numerous intermediate points throughout southern territory.

This cotton traffic is handled by an elaborate complex of connecting and competing railroads. Usually, several carriers participate in the long haul from farm to factory, and a given destination can generally be reached by a number of routes consisting of different combinations of competing lines. Instead of charging the shipper a "combination rate" representing the sum of

1. Suit was brought in this Court pursuant to 28 U.S.C. §§ 1336, 1398, 2284, 2321–2325, and 5 U.S.C.A. § 1009.

2. Southern's restrictive routing program is not limited to cotton. See Alabama Great Southern Railroad Co. v. United States, D.C.N.D.Ala., 162 F.Supp. 614; Southern Railway Co. v. United States, D.C., 154 F.Supp 562; Southern Railway Co. v. United States, D.C., 153 F.Supp. 57.

3. The intervening railroads appearing as defendants in this case are as follows: Alabama, Tennessee & Northern Railroad Company, Atlanta & West Point Rail Road Company, Atlantic Coast Line Railroad Company, Central of Georgia Railway Company, Charleston & Western Carolina Railway Company, Columbia, Newberry & Laurens Railroad Company, Georgia Rail Road & Banking Company—Operated as the Georgia Railroad by lessees: Atlantic Coast Line Railroad Company; Louisville & Nashville Railroad Company, Gulf Mobile & Ohio Railroad Company, Illinois Central Railroad Company, Louisville & Nashville Railroad Company, St. Louis-San Francisco Railway Company and The Western Railway of Alabama.

the local rates of each railroad participating in a given route, the carriers have established lower "joint rates" for most of the routes over which cotton moves east. For over 25 years the railroads have followed an "open routing" policy, giving the shipper a wide variety of routes over which cotton can be carried at the joint rates. The difference between the combination rate and the joint rate is great enough to make it uneconomic for the shipper to use a route to which no joint rate applies.

Over half the cotton manufacturers in southern territory are located at stations served only by the Southern Railway System lines. The principal feature of Southern's routing proposals was that the joint rates to these destinations, local to Southern, would apply only to that route which included the maximum amount of Southern track east of the Mississippi gateways. The practical effect of the proposals would have been to close all the other existing routes to stations served only by Southern. The loss of traffic to the protestant rail carriers which participate in these other routes, and the gain to Southern, was estimated by the parties at between 1,500 and 2,000 carloads per year.

The only guiding principle underlying this wholesale elimination of intermediate carriers appears to be Southern's intent to secure its longest possible haul to destinations which it controls. Southern attempts to justify this restrictive routing by saying that the routes over these intermediate carriers involve "unnecessary and wasteful transportation." However, where another railroad serves the destination mills, either alone or in conjunction with Southern, Southern will bridge any portion of the traffic it can get, regardless of the length of the haul. Apparently, under those circumstances, the interpolation of Southern as the intermediate carrier involves neither unnecessary nor wasteful transportation, or so it seems to Southern.

█ When Southern published its restrictive routing proposals without the consent of the other carriers affected, the Commission suspended the new tariff schedules and set the matter for hearing. Under these circumstances, the Interstate Commerce Act, 49 U.S.C.A. § 15 (7), imposes on Southern the burden of showing that its proposals are "just and reasonable," [4] and 49 U.S.C.A. § 15(3) requires Southern to prove that the cancellation of joint rates over existing routes is "consistent with the public interest." [5] "The term public interest 'as used in the statute, is not a mere general reference to public welfare, but, as shown by the context and purposes of the act, "has direct relation to adequacy of transportation service, to its essential conditions of economy and efficiency, and to appropriate provision and best use of transportation facilities." ' " United States v. Lowden, 308 U.S. 225, 230, 60 S.Ct. 248, 251, 84 L.Ed. 208; State of Texas v. United States, 292 U.S. 522, 531, 54 S.Ct. 819, 78 L.Ed. 1402; New York Central Securities Co. v. United States, 287 U.S. 12, 25, 53 S.Ct. 45, 77 L.Ed. 138. Stated more specifically, Southern had the burden of showing that the interests, not only of Southern, but of the transportation service in general and the shipping public in particular would best be served by closing over seventy-one of

---

4. 49 U.S.C.A. § 15(7) reads in part:
"* * * At any hearing involving a change in a rate, fare, charge, or classification, or in a rule, regulation, or practice, * * * the burden of proof shall be upon the carrier to show that the proposed changed rate, fare, charge, classification, rule, regulation, or practice is just and reasonable * * * "

5. 49 U.S.C.A. § 15(3) reads in part:
█

"If any tariff or schedule canceling any through route or joint rate, fare, charge, or classification, without the consent of all carriers parties thereto or authorization by the Commission, is suspended by the Commission for investigation, the burden of proof shall be upon the carrier or carriers proposing such cancellation to show that it is consistent with the public interest, without regard to the provisions of paragraph (4) of this section."

the routes presently available for cotton traffic.[6]

Southern did not attempt to show that each and every route to be closed was less efficient than a retained route over the Southern system. It offered evidence that some of the Southern routes were shorter and had fewer interchanges than the competing routes, and supplemented this with a parade of statistics showing the large sums spent by Southern in recent years on new yards and equipment to improve the efficiency of the system as a whole. The protestant carriers' evidence demonstrated that some of the routes to be closed were shorter than the retained Southern routes and involved no more interchanges, and that the competing carriers had also expended large sums on improvements.

6. The total number of routes to be closed was never specified, but the protestant railroads offered evidence to show that Southern's restrictive routing would close at least 71 routes which had been in use during the year ended July 31, 1955.

7. The final paragraphs of the Commission report, 302 I.C.C. 637, 652–653, read:
"We are not here dealing with one line or route, but with an intricate network of routes consisting of overlapping lines, or segments of lines, functioning as originating, intermediate, or delivering carriers. To the extent that the present reduced rates would apply only over competitive routes from the gateways, and in connection with particular lines at other junctions, certain routes embracing the protestant carriers would be commercially closed. The Southern does not originate any of this traffic, but serves only as an intermediate or delivering carrier. As stated, the distances from and to representative points over the routes that would be commercially closed do not compare unfavorably with those over the retained routes, and many of the routes proposed to be closed have been and are in active use for the movement of cotton in substantial volume. The transportation conditions over the routes proposed to be closed are not shown to compare unfavorably with those over the routes proposed to be retained.
"A general observation is here pertinent. We do not look with favor upon the method employed by the proponents of these schedules, of attempting to

The Commission held, not that consideration of the public interest required that all of the existing routes be maintained, but that Southern had failed to sustain the burden of showing that each of its routes was more advantageous to the public than the routes to be closed. It stated that Southern could not, "by one sweep of a tariff schedule" and "without serious regard for the needs of the shipping public" close "numerous routes which had long been available for general use." Since Southern made no effort to justify the closing of each route separately, or to divide its proposed tariff into groups of routes which could be considered separately, the entire schedule was cancelled. The Commission's findings and conclusions are summarized in the final paragraphs of its report.[7]

close, by one sweep of a tariff schedule, and apparently without serious regard for the needs of the shipping public, numerous routes which have long been available for general use. Here, no serious effort was made by the proponents to show the distances over representative routes sought to be closed as compared with those over representative routes sought to be retained, and we are left to guess at the relative efficiency or economy of the respective routes. A reduction in the number of participating carriers is not necessarily indicative of increased efficiency or economy in transportation. The term 'public interest' as used in the act means more than a mere general reference to public welfare, or to a desire of a particular carrier or carriers to gain additional traffic, and of particular shippers to forego certain routes for the sake of a reduction in rates over other routes. Consideration must also be given to the interests of the general public as manifested by the traffic moved over the routes proposed to be closed, as well as to the carriers which participate in those routes.

"In view of the substantial movement of this traffic over the routes proposed not to be retained, both prior and following the effective date of the reduced rates, and the serious effect which these restrictions would have upon the carriers proposed to be eliminated as participants in these routes, we are persuaded that the evidence before us would not support a finding that the restrictive routing in

The function of this Court here is limited to determining whether, considering the record as a whole, the findings of the Commission are supported by substantial evidence, Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456, and whether the Commission's conclusions from those findings have a rational basis. Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 54 S.Ct. 692, 78 L.Ed. 1260; New York Central R. Co. v. United States, D. C., 99 F.Supp. 394. There is no contention that the Commission failed to make subordinate findings of fact to support its ultimate findings.[8] The suggestion simply is that the findings as made by the Commission are not supported by the record.

As to the relative efficiency of the particular routes in question, the Commission found that the routes to be closed were not shown to compare unfavorably with the routes to be retained and remarked that Southern had made no serious effort to prove its assertion that the closed routes involved wasteful transportation. The uncontradicted evidence of the protestant carriers demonstrated that many of the routes to be closed were shorter and that some of these involved no greater number of interchanges than the Southern routes.[9] Southern stated in its brief that distance was no real criterion of efficiency, but no evidence of other factors was offered with reference to any particular route. The system-wide statistics which were intended to demonstrate the general efficiency of operations on the Southern were not related to the individual routes. To compare specific routes, Southern offered only one exhibit which listed the dis-

tances over various lines from Memphis and New Orleans to five destinations in Virginia, North Carolina, South Carolina, Georgia and Florida. Inasmuch as none of these destinations was a station local to Southern, the Commission was justified in finding that these few routes were not representative.

Moreover, it may be observed that there was no indication in Southern's exhibit as to which of these routes were actually in use and no comparative analysis of the delays involved in interchanges and other stops over the various routes. In an attempt to fill this gap in the evidence Southern offered, for the first time, in its brief to this Court, averages of the distances over closed and retained routes based on two of the exhibits filed by the protestant carriers. Although these averages are favorable to Southern on the question of distance, they are at most suggestive, rather than probative, of the comparative efficiency of any particular route. The Commission's finding that Southern failed to prove that the routes to be closed were inefficient and wasteful was fully warranted.

Southern's assertion that the routes in which intermediate carriers participate are unnecessary raises the central question of the convenience of the cotton shippers. Here, the basic finding, mentioned three times in the paragraphs quoted herein from the Commission's report, was that, notwithstanding the asserted efficiency of the Southern System, the shippers choose to move a substantial amount of traffic over the routes which Southern proposes to close. This fact is not only undisputed, but it appears to be the primary reason for this litigation. Southern's basic purpose in

connection with the reduced rates would be in the public interest. Thus, the Southern has failed to sustain the burden of proving that the proposed schedules are just and reasonable."

8. Compare Alabama Great Southern R. Co. v. United States, 340 U.S. 216, 227–228, 71 S.Ct. 264, 95 L.Ed. 225.

9. A substantial part of the traffic which

would be affected by the restrictive routing moves through Memphis, Tennessee, to Birmingham, Alabama, on its way east. The distance between these cities via Southern is 284 miles, while it is only 251 miles over the lines of the principal competing carrier. On either route only a single interchange is involved.

these lengthy and costly proceedings seems to be to take advantage of its monopoly of certain cotton destinations to compel the shippers to use routes which they do not presently use under the normal competitive conditions of open routing. Under these circumstances, Southern had the burden of showing that the shippers, or a majority of those affected, approved of, or at least acquiesced in, the proposed restrictions. Southern did not produce a single witness from the thousand or more cotton shippers operating in southern territory. Instead, it chose to rely on the bare assertion that the failure of the shippers to appear before the Commission proved that they favored Southern's proposal. In fact, one prominent shipper did appear and vigorously opposed the closing of certain routes, in particular that between New Orleans and the southeast via Memphis. Even if this evidence were ignored, as Southern argues it should be, nevertheless Southern's case would still be defective in failing to show positively the advantage to the shippers in changing their present practice.

■■ One explanation of Southern's failure to supply more evidence may be found in its repeated assertion that a destination carrier has an overriding "right" to its maximum haul. Southern has argued that such a right may be deduced from the provisions of 49 U.S.C.A. § 15(4) [10] and should have been recognized by the Commission. The short answer to this contention is that 49 U.S.C.A. § 15(3) places the burden on Southern to show consistency with the public interest "without regard to the provisions of paragraph (4) of this section," and that Section 15(4) applies only to the establishment of new through routes and not to the proposed cancellation of existing routes involved herein. United States v. Great Northern R. Co., 343 U.S. 562, 72 S.Ct. 985, 96 L.Ed. 1142. Moreover, Section 15(4) says nothing about the rights or preferences due a destination carrier as such.

The record made before the Commission has been carefully studied. It shows that all relevant evidence offered by the parties at the hearings was received. The parties were afforded ample opportunity to file briefs and make representations concerning that evidence and the applicable law. The requirements of the Interstate Commerce Act and of due process have been observed by the Commission. Its findings and conclusions, clearly reflected in its report, are amply justified by the record. The Commission has, therefore, properly discharged its duty with due regard for the public interest and in accordance with the National Transportation Policy.[11] Its decision must be upheld and the complaint dismissed.

■ It should be noted, however, that the resistance of other railroads, and the Commission, to Southern's attempts to obtain the long haul will not solve the basic problem which besets the railroad industry today. Unquestionably, if railroads are to survive, privately owned as a major vehicle of transportation in this country, a new approach to this problem is an urgent necessity. The public interest no longer requires several sets of tracks, together with the facilities that

10. 49 U.S.C.A. § 15(4) reads in part:
   "In establishing any such through route the Commission shall not * * * require any carrier by railroad, without its consent, to embrace in such route substantially less than the entire length of its railroad * * * which lies between the termini of such proposed through route, (a) unless such inclusion of lines would make the through route unreasonably long as compared with another practicable through route which could otherwise be established, or (b) unless the Commission finds that the through route proposed to be established is needed in order to provide adequate, and more efficient or more economic, transportation: *Provided, however,* That in prescribing through routes the Commission shall, so far as is consistent with the public interest, and subject to the foregoing limitations in clauses (a) and (b), give reasonable preference to the carrier by railroad which originates the traffic."

11. 49 U.S.C.A. preceding section 1.

go with them, owned and operated by different railroads, going to and from the same places. Railroads now receive all the competition the public interest requires from airlines, bus lines, barge lines, motor carriers and the private automobile. But no one railroad may arrogate to itself the over-all job of eliminating duplicating railroad facilities. The problem of eliminating wasteful railroad transportation in this country, by consolidation of lines and otherwise, challenges the Commission itself.

Judgment for defendants.