PUBLIC SERVICE COMMISSION *v.* PHILADEL-
PHIA, BALTIMORE & WASHINGTON
RAILROAD COMPANY.

[No. 63, January Term, 1928.]

*Decided April 11th, 1928.*

106

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Raymond S. Williams,* for the Public Service Commission, appellant.

*William Pepper Constable* and *William L. Marbury, Jr.,* with whom were *William L. Rawls* and *Roland R. Marchant* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

This appeal grows out of an irreconcilable conflict between the views of the respective parties as to the powers, functions and duties of the Public Service Commission of Maryland, in the exercise of the control and supervision conferred upon it by the Legislature over the operation and management of public service corporations. The precise question which it presents is whether the commission has the power to annex, as a condition precedent to its permission to a railroad company engaged in interstate commerce to relocate its tracks, a requirement that the tracks, as relocated, shall be at a grade which in the judgment of the railroad company will be inconsistent with the efficient and economical operation of the railroad, when such a condition is not required by any consideration for the convenience or welfare of the general public, but is solely in the interest of persons whose property would be affected by the relocation. It involves a consideration of whether the "public," in whose interest the commission was created, means the whole public, or only that part of the public whose property rights are directly or consequentially affected by the construction, operation, or maintenance of some public utility under its control and supervision.

To understand the scope and significance of the inquiry it will be necessary to examine briefly the background of

the conflicting theories, and the circumstances under which the question arises in this case.

The Philadelphia, Baltimore and Washington Railroad Company, herein called the Railroad Company, is the successor of the Columbia & Port Deposit Railroad Company, which was incorporated by chapter 103 of the Acts of 1858 of the General Assembly of Maryland, amended by chapter 31 of the Acts of 1868, and which was later merged by a consolidation with the Columbia & Port Deposit Railroad Company of Pennsylvania. Later still its lines were leased to the Pennsylvania Railroad Company, and are used as a part of its system.

Acting under the powers conferred by its charters, the Columbia & Port Deposit Railroad Company constructed, and appellee for many years operated, a railroad along the east bank of the Susquehanna River, between Perryville in Maryland to a point in Pennsylvania, passing in its course through the town of Port Deposit. Some time prior to 1906 interested persons conceived the idea of utilizing the water power of the Susquehanna River by the construction of dams and the establishment of power plants at McCall's Ferry in Pennsylvania and at Conowingo in Maryland, and in furtherance of that plan the McCall's Ferry Power Company was incorporated, and it constructed a dam and power plant at McCall's Ferry, and apparently contemplated the construction of another dam at Conowingo, for, in 1906, it entered into an agreement with the railroad company as to the relocation of that part of its roadbed which would be affected by the construction of both dams. But in 1908 the Susquehanna Power Company, herein called the Power Company, acquired the rights and property of the McCall's Ferry Company along the Susquehanna River below Cully's Falls, and assumed all its obligations in respect to the relocation of the tracks of the Philadelphia, Baltimore and Washington Railroad Company, made necessary by the erection of a dam at Conowingo, to which substitution that company assented, and, on March 24th, 1908, it executed with the power com-

pany a supplemental agreement assenting to the substitution. In the agreement of 1906 the McCall's Ferry Power Company agreed, in case it undertook to build the Conowingo dam—

> "to acquire, as hereinafter provided, the right of way and construct such relocated railbed, track and appurtenances between a point about 850 feet south of Fishing Creek Station, Lancaster County, Pennsylvania, and Rock Run Station, Cecil County, Maryland, the said relocated road bed, track and appurtenances to be constructed upon such alignment and with such grades and in accordance with such plans and specifications as the railway companies may prescribe, and subject to the approval of their chief engineer, or his representative, it being hereby understood and agreed that the alignment shall not be less favorable, nor shall it be required to be more favorable, than that of the present roadbed and track of the said railway between the said points, but that there shall be no grades opposed to the eastbound traffic and that the grades opposed to the westbound traffic shall not be more than 0.3 per cent. equated for curvature, excepting that until the work of constructing the Conowingo dam is undertaken the grade against the westbound traffic may be 0.5 per cent. between a point 850 feet south of Fishing Creek Station and a point 500 feet south of Benton Station."

The charter of the Susquehanna Power Company was amended by chapter 268 of the Acts of 1908 of the General Assembly of Maryland, which authorized it to

> "locate and build in, along or across the said river, and the bed and shores thereof, and the canals, railroads, ferries and highways thereon, therealong or leading thereto, any dam or dams, the crest or crests of which shall not exceed an elevation of 110 feet above mean low tide at Havre de Grace, said dam or dams to be located at any points between Tidewater and Mason and Dixon's line."

Acting under its charter powers, the Susquehanna Power Company made arrangements and formulated plans for the erection of a dam across the Susquehanna River at a point some distance below Conowingo, and applied to the Public Service Commission of Maryland for its approval of its plans for financing the project. The commission approved the plans and the Power Company proceeded with the work of erecting a dam, which would raise the waters of the Susquehanna River to a point 108.5 feet above mean low tide at Havre de Grace, or 60.9 feet above the old level of the river.

As has been stated, the tracks of the railroad were located along the northeast bank of the river, and upon the completion of the dam would necessarily be submerged by the waters impounded by it, and if the railroad was to continue it was necessary to relocate its tracks on some line where its operation would not be affected by the new water level of the pool. The relocation was of course required by the necessities of the Power Company, and since the Railroad Company was satisfied with the then existing location of its tracks, the Power Company assumed the burden of paying all expenses incident to the relocation, which was to be constructed, however, under the direction and supervision of the Railroad Company.

The Columbia & Port Deposit Railroad Company was, as has been stated, consolidated with the Philadelphia, Baltimore & Washington Railroad Company, and the lines of that company are leased to the Pennsylvania Railroad Company, and are operated as a part of its system. For some years past the policy of the latter company has been to establish its railroads as low grade lines, and from time to time it has expended "vast sums" of money in changing, projecting, and building its lines in furtherance of that policy, which has also been adopted by other railroad systems throughout the country, and which is responsible for the present rate structure in the United States and without which that structure could not be maintained. One of the low grade lines operated by the Pennsylvania Railroad Company as part of its system is the Columbia & Port Deposit line, the max-

imum grade of which before the relocation of the tracks was, except for a relatively short section at Fishing Creek, approximately 3 per cent.

The railroad company in accordance with its policy undertook to see that the grade of the line as relocated should be no heavier than that, and, accordingly, its first agreement with the McCall's Ferry Power Company, provided for a 3 per cent. grade, except that a 5 per cent. grade was allowed on a short section at Fishing Creek in Pennsylvania. That agreement was based, however, upon the hypothesis that the dam would be erected at Conowingo, but when application was made to the Federal Power Commission for authority to proceed with the power project, that commission, to better utilize the power of the river, ordered the dam to be located at a point east of Conowingo. That change materially altered the conditions which would have resulted from the establishment of a roadbed on a 3 per cent. grade, as originally contemplated, and would not only have made the construction very expensive, but would have had a ruinous effect upon the town of Port Deposit, since it would have required an embankment through the town which would have been twenty feet high at Port Deposit Station, and, since the location of the dam could not be changed without the approval of the Federal Power Commission, the railroad company and the power company agreed that the relocation should be at a grade of 0.35 per cent. instead of 3 per cent., as originally provided. Thereafter the railroad company applied to the Public Service Commission of Maryland for its approval of a relocation of its tracks to be located and graded in accordance with the following description:

"The proposed new line, as shown in solid red, is the location selected as best fitting the contour of the ground for the ascending grade of 0.35 per cent. northbound, properly equated for curvature. It is proposed to secure a right of way 60 feet in width at grade, except within the lines of Port Deposit, where the width of right of way shall be 36 feet at grade, with such additional land as may be required for slopes, cuts, fills and for drainage purposes, and in

addition such land for station lots, signal towers, water facilities and all other appurtenances as will equal in area the land now held and owned by the railroad for such facilities. * * * The elevation of the top of rail of the relocated rail was fixed at the Conowingo Dam by the elevation of the water in the new pool, viz., plus 108.5 U. S. Government and P. R. R. datum. The elevation of the new top of rail 100 feet west of the base line of the dam will likewise be plus 108.5. The equated grade of 0.35 per cent., therefore, by starting at the elevation of the water in the dam, will reach the grade of the present tracks at Tome Institute Station, the distance from the base line of the dam to the foot of the grade at Tome Institute being 5¾ miles. * * * In order that the top of rail of the relocated line shall be safely above all flood waters, the grade of 0.35 per cent. equated is to be carried northward beyond the dyke a distance of about 3800 feet from the breast of the dam to reach an elevation of plus 102, U. S. Government and P. R. R. datum, which will place the top of rail 11½ feet above the pool level of the dam. The total length of the 0.35 per cent. equated grade from the summit 3,800 feet north of the breast of the dam to Tome Institute Station will be about 6½ miles."

A protest against that application was filed by a committee representing the citizens of the town of Port Deposit, who, after referring to the history, improvements, and advantages of the town, alleged that:

"The relocation of the railroad as projected, elevating these tracks to the height proposed between the river and the street, will have the effect of placing the street in the bottom of a trench and will shut off the view and cut off the breeze and air from the residences as well as the street, and render the town undesirable as a place of residence.

"In times when the river is in flood, the proposed embankment between the street and the river will render the street a perfect sluiceway. The water pour-

ing through the necessary opening at the north end of the town will become a perfect torrent, flowing down the street destroying property the entire length of the embankment.

"If this plan of relocation of the railroad as projected by the Pennsylvania Railroad is carried out, the result will be the absolute destruction of the adjacent property and will materially depreciate all property values through the town.

"We have been assured by competent engineers, that the raising of this embankment is absolutely unnecessary, as the railroad, by increasing their grade no more than one-half inch in each 100 feet, would avoid the destruction of our town."

To understand that protest a brief description of the town is necessary. It is situated in the gorge of the Susquehanna, and is located on a narrow strip of comparatively level land which lies between a series of high bluffs on the east and the river on the west. A state road connecting the state highway at Perryville and the Conowingo road runs through it from northwest to southeast. Between that road and the river are the tracks of the Railroad Company, on which there are two stations, one, the Tome station, at the southern end of the town, and another, the Port Deposit station, a short distance north of that. Relocating the railroad at a grade of .35 per cent. would require a fill or embankment beginning at zero at the Tome station and rising to 6.7 feet at Port Deposit station, and to 15.11 feet at Rock Run near the northern limit of the town. As the grade of the relocated railroad is increased, the height of that embankment or fill will be decreased, which will appear if the roadbed is regarded as a straight line, one end of which is fixed at a point 3800 feet north of the dam, at an elevation of 108.5 above mean low tide at Havre de Grace, and the other end is at the elevation of the original roadbed at Tome station six and one-half miles away, which we will call zero. In such a case, as the zero end of the line is lowered, the grade is increased and the embankment or fill decreased, but

as it is raised the grade is lowered and the height of the embankment increased.

The buildings and improvements in the town are for the most part located along the state highway, and the effect of the embankment required to maintain a grade of .35 per cent. would be, the protestants claimed, to obstruct their view of the river, to lessen the light and air which they now receive, and to convert the main street of the town into a sluiceway, through which the waters of the river will pour in time of flood.

The commission, after considering the application and the protests, and hearing evidence offered in connection with them, refused it as made, but authorized and permitted the Railroad Company "to change the location of a portion of its line of railroad extending from a point near Port Deposit Station, Maryland, to the Maryland-Pennsylvania state line, as in the petition herein set forth, provided that that portion of the said line of railroad, between a point about 200 feet south of Port Deposit station and a point where it will run out south of the Octarora Bridge, when so relocated, shall be built to a 0.38 per cent. grade instead of to a 0.35 per cent. grade as proposed by the said company, and provided further that the said Philadelphia, Baltimore and Washington Railroad Company shall provide access to the Susquehanna river by suitable means at points where public crossings now exist." From that order the Railroad Company appealed to the Circuit Court No. 2 of Baltimore City, and on December 24th, 1927, that court decreed: "That the proviso attached by the Public Service Commission to its approval of the application of The Philadelphia, Baltimore & Washington Railroad Company for the relocation of its lines between a point 2000 feet South of Port Deposit, Cecil County, Maryland, to a point beyond the Maryland-Pennsylvania state line, is null and void," and remanded the case to the Public Service Commission directing it to approve the relocation at a grade of .35 per cent. From that decree this appeal was taken.

The evidence offered before the commission, while divergent, was for the most part not conflicting. The witnesses for the railroad company testified that the change of .03 per cent. in the grade ordered by the commission would diminish the tonnage which an engine of given power could draw over the road, would seriously impair its value as a low grade line, would interfere with the established policy of the entire system of which that section was a part, of maintaining low grade lines, and such interference, if generally permitted, would have an effect on the rate structure now prevailing to the detriment of the general public; that the efficiency of a low grade system is to some extent measured by the grade of any section of the road over which its cars are generally routed, because the capacity of the whole line is measured by the heaviest grade on it where it is long enough to overcome the momentum of the train, rather than by its average grade, and that the original grade of the road was 3 per cent. While there was some disposition to question these conclusions, the testimony offered for that purpose was not sufficient to affect their value, and they must be taken as established.

The evidence offered by the protestants was sufficient to show that the proposed relocation on a grade of .35 per cent. will seriously affect property values in at least a part of the town of Port Deposit, and will seriously interfere with the convenience of at least some of its inhabitants, but whether it will have the extreme effects prophesied by some of the witnesses was not so clearly shown.

The Public Service Commission of Maryland was created by chapter 180 of the Acts of 1910. It exercises a naked statutory authority, and has no powers save such as were expressly granted to it by the Legislature, and such implied powers as are necessary to enable it to exert its express powers. *North. Cent. Rwy. Co. v. Pub. Serv. Commn.*, 124 Md. 152; 22 *R. C. L.* 783; *R. R. Commn. v. Oregon R. Co.,* 17 Or. 65; 2 *L. R. A.* 195. Its creation was dictated by a governmental policy of delegating to certain boards, com-

missions, and other similar agencies, administrative powers and functions in respect to the supervision and control of corporations employed in a public service, which found expression in such laws as the Interstate Commerce Commission Act, of February 4th, 1887, and in many statutes of a similar nature, that state legislatures have passed since that time. That policy was the outgrowth of neccessity, and the paramount law of self-preservation. The welfare, safety, and convenience of the public depended so closely upon the fair and efficient administration of corporations engaged in furnishing transportation, light, power, water, sewage, and other sanitary facilities to the public, that it became necessary to devise some agency by which they could be supervised and controlled in the exercise of their corporate functions and in the use of the privileges granted to them by the State, so as to insure the highest quality of service commensurate with the compensation charged, and to secure a relation between service and rates fair alike to the corporation and the public. *Texas & P. R. R. Co. v. Interstate Commerce Commn.*, 162 U. S. 208; *Interstate Commerce Commn. v. Balto. & O. R. Co.*, 145 U. S. 203. Within those limits such legislation has generally been recognized as constitutional, although there are bounds beyond which the Legislature cannot go, as, for instance, under the guise of regulation and control it cannot authorize the destruction or confiscation of vested rights, or, in the absence of any unlawful act or breach of duty, without just compensation completely take over the operation and management of the corporation, nor can it delegate strictly legislative or judicial powers and functions to such an agency. 22 *R. C. L.* 780; 12 *C. J.* 847, 900. Turning from these general principles to statutes creating commissions or boards for the supervision and control of railroad corporations, it is found that the basic policy running through them all is the protection of the whole public affected by the efficient operation of the railroads for the transportation of freight or passengers at reasonable rates, rather than the protection of private interests affected by the operation of the railroad.

In this case the conflict in the views of the respective parties is the result of the different interpretations which they give the word "public" as used in the statute defining the powers of the commission. As the appellants construe it, it authorizes the commission, in dealing with an application such as that made in this case, to consider the effect of the proposed plan upon private property adjacent to the relocated railroad, and to weigh and balance any damage which it may cause to that property against any advantage which it will give the railroad company, and to grant it or refuse it as the one or the other preponderates. The appellees, however, contend that the only interest which the commission can consider is the interest which the whole public has in the maintenance of an efficient transportation system furnishing to the public adequate facilities at reasonable rates. Both of these views have been forcibly and ably presented in this court, but in our opinion the question is free from any real difficulty. The Legislature, when by chapter 103 of the Acts of 1858 it authorized the Columbia & Port Deposit Railroad Company "to lay off and construct a railroad not exceeding eighty feet in width, with one or more sets of tracks from Port Deposit, in Cecil county, to the Pennsylvania and Maryland line, so as to connect with a contemplated railroad in the State of Pennsylvania, from Columbia to the said Pennsylvania and Maryland line, and, for the purpose of laying off and constructing the said road, they shall have all the powers and privileges, and be subject to all the restrictions and liabilities hereinafter described, and they may take and adopt the route which to them may seem most suitable and proper," must necessarily have considered the effect that such a railroad would have upon the territory to be traversed by it, and it will not be presumed, in the absence of a clear and express declaration to that effect, that it has delegated to any other agency the power to reconsider that question, and to review and revise its judgment so as to take away the corporate franchise which it granted, or strip it of incidents essential to its value, after

the corporation had accepted the franchise, built the railroad, together with its appurtenant switches, sidings, yards, etc., and operated it for many years. Certainly no such authority is to be found in the language of the statutes creating the commission, and defining its powers, duties, and functions, nor in any of the decisions of this court construing those statutes.

Article 23, section 362, provides: (1) "Every corporation, person or common carrier performing the services designated in the preceding sections shall furnish, with respect thereto, such service and facilities as shall be safe and adequate and in all respects just and reasonable. All charges made or demanded by any such common carrier for the transportation of passengers, freight or property, or for any service rendered or to be rendered in connection therewith, as defined in section 349, shall be just and reasonable and not more than allowed by law or by order of the commission, conformably with the law. * * * The Public Service Commission herein created and established shall have the general supervision of all common carriers, railroads, street railroads, railroad corporations and street railroad corporations, transporting passengers, freight or property from one point to another within the State of Maryland, and shall have the power to and shall examine the same or cause the same to be examined and keep informed as to their general condition, their capitalization, their franchises and the manner in which their lines, owned, leased, controlled or operated and managed, are conducted or operated within this state both with respect to the adequacy, security and accommodation afforded by their service, and also with respect to their compliance with all provisions of law and orders of the commission." Section 370 provides in part that: "The commission shall have the general supervision of all common carriers, rairoads, street railroads, railroad corporations and street railroad corporations, and all other corporations and persons subject to the provisions of this sub-title as hereinbefore defined, and shall have the power to and shall examine

the same and keep informed as to their general condition, their capitalization, their franchises and the manner in which their lines, owned, leased, controlled or operated, are managed, conducted and operated, not only with respect to the adequacy, security and accommodation afforded by their service, but also with respect to their compliance with all provisions of law, orders of the commission and charter requirements." Section 372 gives the commission the right to investigate the cause of all accidents on railroads. Section 376 gives it the power to require the carrier to use a sufficient number of men to efficiently operate freight trains. Section 379 prohibits any railroad company from exercising any franchise or right without the approval of the commission, and further provides that "the commission shall have power to grant the permission and approval herein specified whenever it shall, after due hearing, determine that such construction or such exercise of the franchise or privilege is necessary or convenient for the public service."

These quotations fairly reflect the purpose and scope of the entire statute, and it is manifest from an examination of it, as well as of them, that the public interest which is committed to the protection of the commission is the interest which the public has in the operation of railroads in such a manner as to furnish efficient service at reasonable rates, and that the power of the commission over railroad companies lies within those limits. That is to say, it has no power to interfere with any act or policy of the corporation which will not in some manner adversely affect the public interest in its service or rates. There is nothing in the act to support the theory that its purpose was to substitute the commission for the directors and officers of the corporation in the management and operation of the railroad, but every presumption is to the contrary.

In *Gregg v. Pub. Serv. Commn.*, 121 Md. 30, it is said: "It is perfectly apparent that the purpose was to place all corporations handling public utilities under the supervision and control of the Public Service Commission and with power in the commission to regulate the rates charged for

service, but that until the commission did so regulate the charge any act or acts in force respecting them should remain unimpaired." In *Hyattsville v. Wash., W. & G. R. Co.,* 122 Md. 674, it was held that the commission had the power to determine the character of a grade crossing, but that conclusion is supported by the police power of the state, exerted to protect the traveling public in the lawful use of a public highway, as well as to protect the patrons of the railroad. See cases in note *L. R. A.* 1915 E, 752, etc. In *North. Cent. Rwy. Co. v. Pub. Serv. Commn.,* 124 Md. 141, the commission ordered the railroad company "to cease and desist from placing said train No. 200 on a side track or otherwise detaining it when running on its own schedule time, and from holding it back at a point of origin in order to give right of way to through or interstate trains." In reviewing that order this court said: "The effect of the order is to deprive the railroad company of all discretion in respect to the operation of its trains at the time of such delays, which discretion, we think, is absolutely essential to the proper and efficient management and operation of the road and to the safety and general welfare of its passengers; and to the extent that the company is deprived of such discretion the commission has by its general order attempted to operate the appellant's road, and in doing this we think it has exceeded the powers conferred upon it by the statute." In *Pub. Serv. Commn. v. United Rwys. Co.,* 126 Md. 488, it was held that the commission had no power to compel a street railway company to extend its lines where the extension would in its judgment be unprofitable. In the *Havre de Grace Bridge Co. Case,* 132 Md. 22, it is said:

"The only question is, Is the commission invested by the Legislature with the power to direct and control the financitl policy of this company?

"The same question was presented to this court in *Laird v. Balto. & O. R. Co.,* 121 Md. 179, and it was there held that, extensive as were the powers granted to the commission, they did not take away from the corporation its power of control upon a question of financial policy. The same

question was raised in *Binghamton L. H. & P. Co. v. Stevens,* 203 N. Y. 7, where the grant of power to the Public Service Commission was very similar to that contained in our Act of 1910 (chapter 180), and the court in that case said: 'The discretion of a pubblic service commission can not override the discretion of the officers of a corporation in the management of its affairs.'

"In the earlier case of the *D. & H. Co. v. Stevens,* 197 N. Y. 1, the court had said: 'We do not think the legislation alluded to was designed to make the commissioners the financial managers of the corporation, or that it empowered them to substitute their judgment for that of the directors or stockholders of the corporation."

In *Benson v. Pub. Serv. Commn.,* 141 Md. 403, in construing section 379, the court, through Judge Stockbridge, said: "Probably the strongest point upon which the appellants can rely are the words to be found in section 26 of the Act of 1910, that the operation of such road 'is necessary or convenient for the public service.' It may not be entirely easy to give a strict definition of this language, but the same expression is found in a number of other acts in which, where cases have arisen, the abandonment of the line has received judicial approval, when it has been shown, far less conclusively than in the present case, that the operation must result in so serious a financial loss as to render it certain that the road would, before the lapse of much time, inevitably go into the hands of receivers." See also *Pub. Serv. Commn. v. Consol. Gas Co.,* 148 Md. 90.

In this case the commission points to sections 373 and 379 of article 23 as the source of its power for the passage of the order which is the subject of this appeal, but it suggests no valid reason for that contention, and we have been able to discover none. Section 373 authorizes it to require "improvements to" or "changes in any tracks * * *" of any "railroad corporation" which "ought reasonably to be made" to "promote the security or convenience of the public or employees." But the "public" referred to in that section obviously means the whole public, and not a particular part of

it, owning property contiguous to the railroad, and it is not apparent how the interest of the whole public would be served by requiring a railroad to be constructed at a grade which would make transportation over it more expensive and less efficient. Nor is there anything in section 379 to justify its action. That section does, it is true, require the railroad company to secure the approval of the commission before relocating its tracks, and gives it the "power" to grant its approval whenever after due hearing it determines that the relocation is "necessary" or "convenient for the public service." But the grant of the "power" also imposed a correlative duty to exercise it in a proper case, and whilst the language could have been plainer, nevertheless it is clear enough that it did not mean to leave to the uncontrolled and arbitrary discretion of the commission the right to grant or withhold its approval at its pleasure. The Legislature could never have meant that, in such a case as this, the usefulness of a vital link in an interstate transportation system could be crippled or destroyed, through the refusal of the commission to approve a relocation of its tracks in accordance with plans which would insure better service at less expense. But it imposed upon the commission the duty of approving the relocation when in its judgment it would be either necessary or convenient for the "public service," and by "public service" it meant the service which the railroad company was obliged under its charter, the statutes of this State, and the statutes of the United States, and regulations passed pursuant to the authority therein contained, to render.

Whether a corporation shall be created, what its powers, duties, functions and privileges shall be, are all essentially legislative questions, and the Legislature cannot delegate its powers to deal with them to any other body whatever. *Bradshaw v. Lankford,* 73 Md. 430; 12 *C. J.* 839. But it may delegate to a governmental agency the duty of ascertaining whether the conditions and circumstances prescribed as conditions precedent to the operation of the statute or the exercise of any right or privilege under it exist, and, where the powers and privileges granted are affected by a public inter-

est, it may delegate to such a body the power and the duty to regulate and supervise the exercise of such powers and rights, and for that purpose may clothe it with powers *quasi* judicial and *quasi* legislative in character. 10 *L. R. A.,* (N. S.) 250. Upon this principle the right of the Legislature to delegate to a public service commission the right to determine whether the exercise by a corporation of a franchise to supply some public utility is consistent with the public welfare, and, in exercising that power, the right to consider such matters as the capacity of the corporation to render satisfactory service, and the effect which the exercise of the franchise may have upon other corporations or agencies rendering like service in the same field. Obviously the meaning of "public interest" in such cases must vary to some extent with the character of the utility. Where the utility is by its nature confined to a definite and limited territory, such as the supply of water, gas, light, power, or sewage facilities, the "public" affected is narrower than in the case of a railroad which offers service to the whole public. And the commission, in determining whether a corporation should be allowed to exercise a franchise to supply the inhabitants of a given territory with water, might be affected by considerations which would not influence it in determining whether a railroad company should be permitted to exercise a right to make some change in its road which would enable it to render better and cheaper service, but in either case the controlling consideration would be the public interest, in the one case the interest of what might be called the local public served by the water company, in the other the interest of the wider public served by the railroad. And in dealing with the interests of the wider public we do not feel that the action of the commission should be hampered or influenced by the necessity of considering the effect of the improvement on the local public, when its effect on the wider public of which the local public is a part will be beneficial.

This case, in our judgment, demonstrates the soundness of that conclusion. Here the state authorized the construction of a dam which necessarily destroyed a section of the ap-

pellee's railroad, and made it impossible for it to operate it at all unless it relocated its tracks. Under that compelling necessity, it applied for permission to relocate its tracks under the authority of section 206, article 23, of the Code, and was entitled to demand that it be permitted to establish its railroad on the new location at a grade as advantageous as that which it had been forced to abandon, so far as that was reasonably and practically possible. That application was refused on the ground that, while the proposed grade of the relocated road would be in the interest of the whole public, it would be against the interest of the local public, the effect of which was to some degree to subordinate the interest of the whole public to the interest of a part of it.

That such a policy if permitted might have a disastrous effect upon the interests of the whole public can hardly be questioned. The health, security, and convenience of the inhabitants of the whole nation largely depend, under existing conditions, upon adequate facilities for the transportation of freight and passengers. Such facilities are in a large part furnished by its railroad systems, for which there is no adequate available substitute. Taken together they form an intricate network of ways over which the products of any part of the country may be transported with reasonable dispatch and at reasonable rates to any other part of the country however remote. The efficiency of these systems depends largely upon the maintenance of low grades in the construction of their road beds. Transportation over such grades is cheaper than transportation over heavier grades. That saving is reflected in the rates charged for the service, and benefits the whole public, and whilst that general policy may result in hardships in individual cases, it is essential to the welfare of the whole public. For if railroads were required to raise or lower their grades to serve the convenience or advance or protect the interests of that part of the local public owning land or residing in its vicinity, their efficiency would be greatly lessened.

For these reasons, in our opinion, the commission, in annexing to its permit for the relocation of appellee's railroad a proviso that it should be established at a grade of .38 per cent., exceeded its powers, and the application of the Railroad Company to relocate its railroad at a grade of .35 per cent. should have been granted. The decree of the trial court will therefore be affirmed.

*Decree affirmed, with costs.*

ADKINS, J., dissents.