## LOWDEN et al. v. UNITED STATES et al.
### No. 615.

District Court, N. D. Illinois, E. D.

July 31, 1939.

Wm. F. Peter, of Chicago, Ill., for plaintiffs.

William J. Campbell, U. S. Atty., of Chicago, Ill., for defendants.

Before EVANS, Circuit Judge, and WOODWARD and DUFFY, District Judges.

DUFFY, District Judge.

The Chicago, Rock Island and Pacific Railway Company, comprising 8,138 miles of railroad (hereinafter referred to as the "Pacific Company"), and The Chicago, Rock Island and Gulf Company, comprising 652 miles of railroad (hereinafter referred to as the "Gulf Company"), are both in bankruptcy for the purpose of reorganization under Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205. The plaintiffs were appointed trustees of both properties. The Pacific Company owns all of the capital stock and the bonds of the Gulf Company. Notwithstanding the separate organization, the Gulf Company is a component part of the Rock Island System.

On November 8, 1937, the petitioners, who are the plaintiffs herein, filed with the Interstate Commerce Commission an application for authority under Paragraph (4) of Section 5 of the Interstate Commerce Act, 49 U.S.C.A. § 5(4) to lease the railway and properties of the Gulf Company. Hearings were had by the Commission, and Division Four thereof issued its report, dated October 29, 1938, in which it was found:

"Subject to the foregoing conditions, we find that the proposed lease by Frank O. Lowden, James E. Gorman and Joseph B. Fleming, as trustees in reorganization proceedings of The Chicago, Rock Island and Pacific Railway Company and of the properties of The Chicago, Rock Island and Gulf Railway Company, of which they are also trustees in reorganization proceedings, upon the terms and conditions proposed, will be in harmony with and in furtherance of the Commission's plan for the consolidation of railroad properties, and will promote the public interest.

"No order will be entered approving and authorizing the lease pending notice to us that the applicants accept the foregoing conditions."

Said findings further stated: "No change in train operations is herein involved. Operation by the Rock Island under the proposed lease will not impose upon the public any conditions pertaining to transportation of freight different from those now in effect, will result in no change in service to the public, and will have no effect upon rates or routes."

The findings also contained the following provision: "The only change which will be effected, if the lease be approved, will be in the accounting department of the Gulf at Fort Worth. The applicants show that duplication of accounting could be eliminated in connection with interline and foreign freight, equipment rents and repairs, purchase of company material, payrolls, and to a minor extent in connection with passenger traffic, and that unified operation as proposed would permit discontinuance of the compilation of separate statistics and the making of separate reports. This change would be brought about by the transfer of 20 employees from Fort Worth to the accounting department of the Rock Island at Chicago, and the dismissal of 49 employees, unless business increased sufficiently to warrant the retention of a greater number of men, resulting in an estimated annual saving of $100,000 of which $6,000 or $7,000 would accrue to the Gulf and the remainder to the Rock Island. On argument counsel for the applicants stated that since the hearing in this case, it has been determined that the 20 employees referred to will be retained at Fort Worth for the present. The estimate does not include a possible saving of $5,925 for office rent at Fort Worth, which is dependent upon whether the vacated office space can be sublet. The general officers of the Gulf will continue to represent Rock Island interest but as officers of the Rock Island, and as at present some of them will have jurisdiction of Rock Island lines outside of the State of Texas. The testimony is that no saving could be effected except by the dismissal and transfer of employees involved."

The following finding also was made: "It is clear from the record that the duplicate accounting now necessary under the present plan of operating the properties of the applicants requires excessive expenditures not in the public interest and which are a burden on interstate and foreign commerce. We are of the opinion, how-

ever, that provision should be made for the protection of the employees who will be forced to accept positions at reduced compensation, or who will be dismissed, or who will be required to change the place of their employment as a result of operation under the lease herein considered."

The entire Commission affirmed the findings of Division Four.

The petitioners obtained a reargument before the entire Commission and on April 3, 1939, the Commission issued its report and entered an order authorizing said lease, but only upon conditions which may be summarized as follows:

### Retained Employees.

(a) No employee of either party to the lease shall, for 5 years after lease operation begins, be placed, as a result of lease operations, in a worse position with respect to compensation and rules governing working conditions than he occupied at the rate of commencement of lease operations, as long as he is unable in the exercise of seniority rights, to obtain a position producing compensation equal to or exceeding the compensation of the position held by him at such date of commencement; as long as he is unable to obtain such equal compensation, he shall be entitled to a monthly allowance equal to the difference between the monthly compensation actually received under lease operations and monthly compensation of the position in which he was displaced.

(b) If required to change the point of his employment as the result of lease operation, and if required thereby within one year from commencement thereof to move his place of residence, he shall be reimbursed for expense of moving his household effects and traveling expenses of himself and immediate family; also his actual wage loss, not exceeding two days.

(c) Any employee shall be protected against any loss suffered in the sale of his home within one year of the effective date of lease operations, for not less than its fair value; or against loss in securing the cancellation of an unexpired lease of a dwelling house occupied as a home by such employee.

### Dismissed Employees.

(a) Any employee who is dismissed because his position is abolished or because he loses it by exercise of seniority rights by an employee whose position is abolished as a result of lease operation, shall be accorded a monthly allowance while deprived of employment, equal to 60% of his average monthly compensation during the last 12 months of his employment. The period of such monthly allowance is as follows:

| Length of Service | Period of Employment |
|---|---|
| 1 yr. and less than 2 yrs. | 6 months |
| 2 yrs. and less than 3 yrs. | 12 months |
| 3 yrs. and less than 5 yrs. | 18 months |
| 5 yrs. and less than 10 yrs. | 36 months |
| 10 yrs. and less than 15 yrs. | 48 months |
| 15 yrs. and over | 60 months |

The dismissal allowance ceases prior to the expiration of the prescribed period in the event of certain contingencies; and is subject to reduction in the case of employment elsewhere, if monthly earnings plus dismissal allowance exceed his former railroad pay.

The report of the entire commission also contained the following provisions: "Accordingly, we find that, subject to the conditions prescribed in the previous report herein dated October 29, 1938, the proposed lease by Frank O. Lowden, James E. Gorman and Joseph B. Fleming, trustee in reorganization proceedings of The Chicago, Rock Island and Pacific Railway Company, of the properties of The Chicago, Rock Island and Gulf Railway Company, of which they are also trustees in reorganization proceedings, upon the terms and conditions proposed, will be in harmony with and in furtherance of our plan for the consolidation of railroad properties, and will promote the public interest, and we will enter an appropriate order, effective 40 days from its date."

Proof was made at the hearing before this court that approximately 53 employees would lose their positions under the proposed lease; and that, should the conditions as to dismissed employees be carried out, the cost to the petitioners would be approximately $280,758 over a period of five years; and that compliance with the other conditions would cost the petitioners not less than $10,000.

There are no issues of fact involved, and the sole question to be determined is whether the Interstate Commerce Commission had the legal power to impose the conditions contained in the report of its Division Four, and adopted by the entire Commission in its report and order of April 3, 1939.

It is fundamental that the Commission may only exercise the authority legal-

ly delegated to it by Congress. United States v. Penn R. Co., 242 U.S. 208, 37 S.Ct. 95, 61 L.Ed. 251.

The statutory authority relied on is Section 5 (4) of the Interstate Commerce Act, 49 U.S.C.A. § 5(4):

"(a) It shall be lawful, with the approval and authorization of the Commission, as provided in subdivision (b), for two or more carriers * * * to * * * lease * * * the properties, or any part thereof, of another. * * *

"(b) * * * If after such hearing the Commission finds that, subject to such terms and conditions and such modifications as it shall find to be just and reasonable, the proposed consolidation, merger, purchase, lease, operating contract, or acquisition of control will be in harmony with and in furtherance of the plan for the consolidation of railway properties established pursuant to paragraph (3), and will promote the public interest, it may enter an order approving and authorizing such consolidation, merger, purchase, lease, operating contract, or acquisition of control, upon the terms and conditions and with the modifications so found to be just and reasonable."

It is urged by the defendants that under the provision "and will promote the public interest", the Commission was within its legal powers in imposing the conditions hereinbefore stated. There can be no question but that the conditions imposed by the Commission were very desirable from the standpoint of social welfare; however, our inquiry must be confined to a consideration of whether the Commission possessed the power and authority which it attempted to exercise.

■ This court feels bound by the interpretation of the phrase "and will promote the public interest" which the Supreme Court has heretofore given when it considered same in connection with the Interstate Commerce Act.

In the case of New York Central Securities Company v. United States, 287 U. S. 12, 53 S.Ct. 45, 48, 77 L.Ed. 138, the Supreme Court, in an opinion by Chief Justice Hughes, considered the words "public interest" and stated: "The provisions now before us were among the additions made by Transportation Act, 1920, and the term 'public interest' as thus used is not a concept without ascertainable criteria, but has direct relation to adequacy of transportation service, to its essential conditions of economy and efficiency, and to appropriate provision and best use of transportation facilities, questions to which the Interstate Commerce Commission has constantly addressed itself in the exercise of the authority conferred."

In the case of Texas et al. v. United States, 292 U.S. 522, 54 S.Ct. 819, 824, 78 L.Ed. 1402, the court said: "The criterion to be applied by the Commission in the exercise of its authority to approve such transactions—a criterion reaffirmed by the amendments of Emergency Railroad Transportation Act, 1933—is that of the controlling public interest. And that term as used in the statute is not a mere general reference to public welfare, but, as shown by the context and purpose of the act, 'has direct relation to adequacy of transportation service, to its essential conditions of economy and efficiency, and to appropriate provision and best use of transportation facilities.' "

In the case of Schechter Poultry Corporation v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947, the court commented upon the powers which Congress has given to the Interstate Commerce Commission and stated 295 U.S. at page 540, 55 S.Ct. at page 847, 79 L.Ed. 1570, 97 A.L.R. 947: "When the Commission is authorized to issue, for the construction, extension, or abandonment of lines, a certificate of 'public convenience and necessity,' or to permit the acquisition by one carrier of the control of another, if that is found to be 'in the public interest,' we have pointed out that these provisions are not left without standards to guide determination. The authority conferred has direct relation to the standards prescribed for the service of common carriers, and can be exercised only upon findings, based upon evidence, with respect to particular conditions of transportation."

In the case of West v. Philadelphia B. & W. R. Company, 155 Md. 104, 141 A. 509, the railway company desired to relocate its tracks and applied to the Public Service Commission of Maryland for approval. The Commission attached a condition fixing the minimum grade for the new line, which was different than the grade desired by the railroad. The Commission justified the condition imposed on the ground that the grade desired by the railroad would injure the adjacent property by obstructing the view, lessening light and air, etc. The court stated 141 A. at page 515: "These quotations fairly

reflect the purpose and scope of the entire statute, and it is manifest from an examination of it, as well as of them, that the public interest which is committed to the protection of the commission is the interest which the public has in the operation of railroads in such a manner as to furnish efficient service at reasonable rates, and that the power of the commission over railroad companies lies within those limits," and, 141 A. at page 516, stated further: "But the 'public' referred to in that section obviously means the whole public, and not a particular part of it owning property contiguous to the railroad. * * *"

█ Under the repeated interpretations of our Supreme Court, it is clear that Congress has not delegated to the Commission the power to improve conditions which have to do with the private employer-employee relationship, by reason of the phrase "will promote the public interest."

It is persuasive, although not controlling, that the Commission itself had grave doubts as to their authority to impose said conditions. The Commission divided six to four and, in addition, Commissioner Eastman, one of the majority, stated in his concurring opinion: "While I think there is reasonable doubt whether, in approving this lease, we have power as the law now stands to attache a condition for the protection of the railroad employees who may be adversely affected thereby, such protection is desirable and in the public interest * * *"

Furthermore, in the reports which the Commission made to Congress for the years 1935 and 1936, there were recommendations for further statutory provisions to protect employees from undue financial loss as a consequence of authorized railway unifications. Although Congress has amended the Interstate Commerce Act in other respects, it has made no change in Paragraph (4) of Section 5.

██ The conditions which were made a part of the order of the Commission dated April 3, 1939, are beyond the power of the Interstate Commerce Commission to impose and are illegal and void; and the petitioners are entitled to an order enjoining, setting aside, annulling and suspending that part of the order which refers to and consists of said conditions, and perpetually restraining and enjoining the defendants from enforcing or attempting to enforce that part of the order.

█ There can be no question that this court has jurisdiction of the subject matter and of the parties to this suit, and has the power under the provisions of the Urgent Deficiencies Act of October 22, 1913, Chapter 32, 38 Stat., 220, 28 U.S.C.A. § 47, to enjoin, annul, and set aside said conditions without enjoining, annulling, or setting aside said order in its entirety.

We desire to emphasize, however, that nothing contained in this opinion shall be construed as passing upon the validity of said order of the Interstate Commerce Commission, dated April 3, 1939, with said conditions annulled and set aside.