## RAILWAY LABOR EXECUTIVES' ASS'N et al. v. UNITED STATES et al.

### Civil Action No. 9011.

District Court of the United States for the District of Columbia.

March 6, 1941.

Edward C. Kriz, of Washington, D. C., and Frank L. Mulholland, Clarence M. Mulholland, and Willard H. McEwen, all of Toledo, Ohio, for plaintiff.

Robert H. Jackson, Atty. Gen., and S. R. Brittingham, Jr., Sp. Asst. to Atty. Gen., for the United States.

J. R. Bell, of Washington, D. C., and Frank Karr and C. W. Cornell, both of Los Angeles, Cal., for Pacific Electric Ry. Co.

Daniel W. Knowlton, Chief Counsel, and E. M. Reidy, both of Washington, D. C., for Interstate Com. Commission.

Before GRONER, Chief Justice, VINSON, Associate Justice, and WHEAT, Justice.

GRONER, C. J.

Pacific Electric Railway Company owns and operates electric railroads and motor bus and truck lines in and near the City of Los Angeles, California. It is a wholly owned subsidiary of Southern Pacific Railroad Company, with the lines of which it connects at numerous points. Southern owns all of its capital stock and a substantial portion of its bonds. The companies are operated separately in both interstate and intrastate commerce. In November, 1939, Pacific applied to the Interstate Commerce Commission for a certificate of public convenience and necessity, authorizing it to abandon certain of its lines of railroad in Los Angeles, Orange, and Riverside Counties, California. The application involved approximately 90 miles of trackage. The plan contemplated the abandonment of certain rail lines, the rehabilitation of others, and the substitution of motor bus and motor truck service as a means "of increasing operating revenues, reducing expenses, and rendering a more adequate service to the public". The Commission accepted jurisdiction, and the railway brotherhoods, who are plaintiffs in this action, were permitted to intervene to protect the interests of Pacific's employees. After a hearing in March, 1940, Division 4 issued an order granting Pacific's application in principal part. The Division refused, however, any conditions for the protection of displaced employees, on the ground that the Commission had no authority to do this under the applicable provisions of the Interstate Commerce Act.[1] Reargument before the full Commission, requested by the brotherhoods, was denied; whereupon this action was begun.

Questions of venue are waived, and the jurisdiction of this court is conceded under 28 U.S.C.A. § 41 (28) et seq.

The question is whether the order, to the extent that it denies the requested conditions for want of power to impose them, is erroneous in law. Admittedly, we have power to annul or suspend an order of the Commission in whole or in part. 28 U.S. C.A. § 41 (28). The answer requires—for reasons which follow—a comparison of two sections of the Interstate Commerce Act.

Section 1 (18)[2] forbids a carrier by railroad to acquire new lines or to extend its own lines without obtaining a certificate of

[1] Interstate Commerce Act, § 1(18–20), 49 U.S.C.A. § 1(18–20).

[2] After ninety days after this paragraph takes effect "no carrier by railroad sub-

public convenience and necessity from the Commission, and likewise forbids a carrier to abandon all or any portion of any line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future *public convenience and necessity* permit of such abandonment. Section 1 (20) [3] authorizes the Commission to issue the certificate and to attach thereto "such terms and conditions" as in its judgment the *public convenience and necessity may require.*

Section 5, as amended in 1920, provided for the adoption of a general plan for the consolidation of the country's railroads into a limited number of systems and required, inter alia, the Commission's approval of any consolidation or lease of railroad facilities. Section 5(4) (b) [4] authorized the Commission, if it found that, subject to such terms and conditions and such modifications as it shall find to be just and reasonable, the proposed consolidation will be in harmony with and in furtherance of the adopted general plan and *"will promote the public interest"*, to give its approval, "upon the terms and conditions and with the modifications so found *to be just and reasonable"* (italics supplied). This section was rewritten in 1940 [5] and there is no longer any requirement that particular

ject to this part [chapter] shall undertake the extension of its line of railroad, or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this part [chapter] over or by means of such additional or extended line of railroad, unless and until there shall first have been obtained from the commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line of railroad, and no carrier by railroad subject to this part [chapter] shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment." 49 U.S.C.A. § 1 (18).

3 "The commission shall have power to issue such certificate as prayed for, or to refuse to issue it, or to issue it for a portion or portions of a line of railroad, or extension thereof described in the application, or for the partial exercise only of such right or privilege, and may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require. From and after issuance of such certificate, and not before, the carrier by railroad may, without securing approval other than such certificate, comply with the terms and conditions contained in or attached to the issuance of such certificate and proceed with the construction, operation, or abandonment covered thereby. Any construction, operation, or abandonment contrary to the provisions of this paragraph or of paragraph (18) or (19) of this section may be enjoined by any court of competent jurisdiction at the suit of the United States, the commission, any commission or regulating body of the State or States affected, or any party in interest; and any carrier which, or any director, officer, receiver, operating trustee, lessee, agent, or person, acting for or employed by such carrier, who knowingly authorizes, consents to, or permits any violation of the provisions of this paragraph or of paragraph (18) of this section, shall upon conviction thereof be punished by a fine of not more than $5,000 or by imprisonment for not more than three years, or both." 49 U.S.C.A. § 1(20).

4 "Whenever a consolidation, merger, purchase, lease, operating contract, or acquisition of control is proposed under subdivision (a), the carrier or carriers or corporation seeking authority therefor shall present an application to the Commission, and thereupon the Commission shall notify the Governor of each State in which any part of the properties of the carriers involved in the proposed transaction is situated, and also such carriers and the applicant or applicants, of the time and place for a public hearing. If after such hearing the Commission finds that, subject to such terms and conditions and such modifications as it shall find to be just and reasonable, the proposed consolidation, merger, purchase, lease, operating contract, or acquisition of control will be in harmony with and in furtherance of the plan for the consolidation of railway properties established pursuant to paragraph (3), and will promote the public interest, it may enter an order approving and authorizing such consolidation, merger, purchase, lease, operating contract, or acquisition of control, upon the terms and conditions and with the modifications so found to be just and reasonable." 41 Stat. 482, 48 Stat. 217, 49 U.S.C.A. § 5.

5 Transportation Act of 1940, § 7, 54 Stat. 905, 49 U.S.C.A. § 5.

transactions shall be in harmony with any general plan. Only the previous language is pertinent here, however, because of analogies arising out of its interpretation by the Supreme Court in United States v. Lowden, 308 U.S. 225, 60 S.Ct. 248, 84 L.Ed. 208.

The important difference in the language used by Congress in the respective sections is that in the abandonment section the Commission was and is authorized to issue the certificate if the public convenience and necessity *permit,* and to impose such terms and conditions as the public convenience and necessity *require,* whereas under the consolidation section the certificate issued only if the proposal was in harmony with the general plan of consolidations and would promote the public interest. Upon such a finding, the Commission might apply *just and reasonable conditions.* In neither section had there been any specific authorization to include in the required terms any provision for compensation to employees affected by the change in structure or operation of the railroad, but the Commission construed the *consolidation* section as granting such authority and the *abandonment* section as denying it. Plaintiffs insist that the congressional language does not warrant this difference of construction.

In Chicago G. W. R. Co. Trackage, 207 I.C.C. 315, 321 (a proceeding under the abandonment section), the Commission said:

"It will be noted that the power to attach terms and conditions to certificates is restricted to such as may be required by the public convenience and necessity. In Wisconsin Telephone Co. v. Railroad Commission, 162 Wis. 383 [156 N.W. 614, L.R.A. 1916E, 748], 'Public convenience and necessity' was defined as 'a strong or urgent public need.' Public-Convenience Application of Utah Terminal Ry., 72 I.C.C. 89.

"In the present case the conditions sought [provisions for payment of wages, etc.] have no relation to the public convenience and necessity; they are offered for the purpose of maintaining a private benefit, the benefit of continued employment. From the standpoint of effect this case is similar to cases involving the abandonment of lines of railroad with resulting unemployment. We have consistently held that the effect of abandonment upon employment cannot be controlling in the disposition of such cases. To hold otherwise would place us in the position of attempting to insure employment to the personnel of carriers whether or not the affected employees were needed."

Then, referring to its earlier report in St. Paul Bridge & Terminal Railway Co. Control, 199 I.C.C. 588, a proceeding in consolidation, the Commission said: "The present proceeding differs from that one in that it is brought under the provisions of section 1(18–20). Our power to impose conditions is stated in different terms in the two sections. Whatever may be the extent of our right to attach conditions in section 5(4) proceedings we are of the view that under section 1(20) the terms and conditions we may attach must be such as in our judgment public convenience and necessity require. We may not properly borrow from section 5(4) and read into section 1 (20) the power to impose such terms and conditions as we may find to be just and reasonable. Our sympathy for employees and full realization of the hardship that may and often does result to them in the administration of the abandonment and other provisions of section 1(18–20) do not enlarge our statutory power or enable us to attach any conditions except those required by public convenience and necessity." [6]

In the St. Paul Bridge case, the Commission had said the term *public interest* as used in the consolidation section was broad enough to comprehend every public interest and the interest of every group or element of the public, and accordingly had held it applicable to the welfare of employees. And this view was adhered to and followed in Associated Railways, 228 I.C.C. 277, 335, 336, in Louisiana & Arkansas Railway Co., 230 I.C.C. 156, 164, in Chicago Rock Island & Gulf R. Co. Trustee's Lease, 230 I.C.C. 181, 186, 187, and again on rehearing, 233 I.C.C. 21. The order in the last mentioned case, to the extent that it imposed the

6 The Chicago G. W. R. & Co. Trackage case was followed subsequently in— Delaware River Ferry Abandonment, 212 I.C.C. 580; Colorado & Southern R. Co. Abandonment, 217 I.C.C. 366, 381; Pooling of Ore Traffic, 219 I.C.C. 285, 294; Chicago Rock Island & P. R. Co. Abandonment, 230 I.C.C. 341, 347; Copper River & N. W. R. Co. Abandonment, 233 I.C.C. 109, 113; Gulf, Texas & W. R. Co. Abandonment, 233 I.C.C. 321, 331; Quincy, Omaha & K. C. R. Co. Abandonment & Control, 233 I.C.C. 471, 486; Chicago, Springfield & St. Louis R. Co. Receiver et al. Abandonment, 236 I.C.C. 765, 772; Chicago, Milwaukee Abandonment, 240 I.C.C. 183.

conditions, was set aside by a three-judge District Court. Lowden v. United States, D.C., 29 F.Supp. 9. On appeal, the Supreme Court reversed. United States v. Lowden, 308 U.S. 225, 60 S.Ct. 248, 84 L.Ed. 208. Mr. Justice Stone, who wrote the opinion, upheld the exercise of power, not on the ground, relied on by the Commission, that the term was broad enough to include every public interest, including that of the employees, but on the narrower ground that the welfare of the dismissed employees was a part of the public interest in the adequacy of a public transportation system. Referring to New York Central Securities Corp. v. United States, 287 U.S. 12, 53 S.Ct. 45, 77 L.Ed. 138, and to Texas v. United States, 292 U.S. 522, 54 S.Ct. 819, 78 L.Ed. 1402, where it was held that public interest "is not a mere general reference to public welfare" but "has direct relation to adequacy of transportation service, to its essential conditions of economy and efficiency, and to appropriate provision and best use of transportation facilities" [308 U.S. 225, 60 S.Ct. 251, 84 L.Ed. 208], he said the single question is whether: "the granting or withholding of the protection afforded to the employees by the prescribed conditions can have no influence or effect upon the maintenance of an adequate and efficient transportation system which the statute recognizes as a matter of public concern."

Then holding that it had such relation, he said: "In the light of this record of practical experience and Congressional legislation [in relation to railway labor], we cannot say that the just and reasonable conditions imposed on appellees in this case will not promote the public interest in its statutory meaning by facilitating the national policy of railroad consolidation; that it will not tend to prevent interruption of interstate commerce through labor disputes growing out of labor grievances, or that it will not promote that efficiency of service which common experience teaches is advanced by the just and reasonable treatment of those who serve."

The effect of this decision is to approve definitely the attitude of the Commission in consolidation cases and to set at rest any existing doubt of the Commission's discretionary power in such cases, under the then existing provisions of the Act, to impose terms with relation to displaced employees. The analogy to abandonment cases is apparent if the applicable language of Section 1(20) is considered, equally with that in 5(4), as intended to apply to and be consistent with the congressional plan for the development and maintenance of an adequate railroad system. And this, we think, is as true as can be. Section 1(18–20) is not, it should be remembered, confined solely to abandonment cases. It applies as well to extensions of lines, construction of new lines, and the acquisition or operation of "any line of railroad, or extension thereof". In any of these respects it would hardly be contended that the section had no relation to the maintenance of an adequate railway system. Indeed, that it has such relation has been expressly decided by the Supreme Court. For example, in Western Pacific California R. Co. v. Southern Pac. Co., 284 U.S. 47, 50, 52 S.Ct. 56, 57, 76 L.Ed. 160, the Court said: "Paragraphs 18 to 22 [of Sec. 1] were considered here in Texas & Pacific R. Co. v. Gulf, Colorado & Santa Fe R. [Co.], 270 U.S. 266, 46 S.Ct. 263, 70 L.Ed. 578, and were declared to be part of the general plan by which Congress intended to promote development and maintenance of adequate railroad facilities". And see Texas, etc., R. Co. v. Northside Belt R. Co., 276 U.S. 475, 479, 48 S.Ct. 361, 72 L.Ed. 661, and also Chesapeake & Ohio R. v. United States, 283 U.S. 35, 42, 51 S.Ct. 337, 75 L.Ed. 824, to the same effect.

While it is quite true these cases dealt with construction of new track and not with abandonment, the statutory test is the same. And from this it follows that the question, in the latter class, is necessarily whether the public interest in an adequate system of railways permits the proposed abandonment. This was recognized in the opinion of Mr. Justice Brandeis in Colorado v. United States, 271 U.S. 153, 168, 46 S.Ct. 452, 456, 70 L.Ed. 878. There he said: "The sole test prescribed is that abandonment be consistent with public necessity and convenience. In determining whether it is, the Commission must have regard to the needs of both intrastate and interstate commerce; for it was a purpose of Transportation Act 1920 to establish and maintain adequate service for both." And this brings us, we think, inevitably to the conclusion that the phrase "Public necessity and convenience" was intended to have substantially the same meaning as the phrase "public interest" in § 5(4), and that the Commission's authority to "attach to the issuance of the certificate (of abandonment) such terms and conditions as in its judgment the public convenience and necessity may require" likewise embraces as

a factor for consideration the displacement of employees with its consequences on efficiency of the transportation system. In this view, the provisions of § 1(18–20) can only be read in the light of the Supreme Court's interpretation of § 5(4) (b) in the Lowden case, 308 U.S. at page 236, 60 S.Ct. at page 254, 84 L.Ed. 208, viz.: "The now extensive history of legislation regulating the relations of railroad employees and employers plainly evidences the awareness of Congress that just and reasonable treatment of railroad employees is not only an essential aid to the maintenance of a service uninterrupted by labor disputes, but that it promotes efficiency, which suffers through loss of employee morale when the demands of justice are ignored."

The Commission, however, insists that the case cannot be thus disposed of. After the Lowden decision, it adhered to its original views and declined to apply the analogy we think exists between the two sections.[7] The Commission says it is at least not so clear as to avoid the duty to endeavor to construe the different sections so as to give effect to what the Commission thinks was the plain intention of Congress in the enactment of the respective sections. The argument to this point is that the Commission for five years prior to 1940 had consistently taken the position that it had no authority to impose conditions for the benefit of labor in abandonment cases and called the attention of Congress to its position in this regard, and with this knowledge Congress in the Transportation Act of 1940, in rewriting essential parts of the Act and in conferring added authority on the Commission in various respects, refrained from making any change in Section 1(18–20). But the rule that re-enactment of a statute after it has been construed by officers charged with its enforcement impliedly adopts the construction, applies only when the construction is not plainly erroneous. United States v. Missouri P. R. Co., 278 U.S. 269, 49 S.Ct. 133, 73 L.Ed. 322. "The persuasion that lies behind that doctrine is merely one factor in the total effort to give fair meaning to language". Federal Communications Commission v. Columbia Broadcasting System, 311 U.S, 132, 61 S.Ct. 152, 154, 85 L. Ed. ——. For, as was said by the Supreme Court in United States v. Stewart, 311 U. S. 60, 69, 61 S.Ct. 102, 85 L.Ed. ——, the interpretation of the meaning of each phrase must be closely related to the time and circumstances of its use. Here the phrases found in the two sections of the Act were written in 1920. As we have pointed out, there is nothing in the 1920 Act itself or in its legislative history which indicates that Congress had in mind either in the case of consolidation or of abandonment the protection of displaced employees. But in the Lowden case the Supreme Court found in the language of the consolidation section what appeared to it to be a clear implication that Congress, to maintain an adequate and efficient railway system, intended to provide—in the discretion of the Commission—for dismissed employees. And this question being settled, and the phrase used in the abandonment section being, as we think, directed to the same end, it is difficult, if not impossible, to deny it a similar implication. In this view, it may very well be considered that in the amendment of the consolidation section in 1940 and the failure to amend the abandonment section Congress merely intended to make the conditions mandatory in the former and leave them simply discretionary in the latter.

At our request counsel have filed supplemental briefs on the significance of the legislative history of S. 2009, which culminated in the Transportation Act of 1940. It appears that a few comments were made in debate, and some discussion, none too clear, was had in the committee hearings, upon the protection of employees in abandonment cases. Later a bill was introduced to require the Commission in abandonment cases to impose conditions prohibiting the displacement of employees. This bill apparently never came to a vote. These discussions resulted only in the enactment of a provision *requiring* a "fair and equitable arrangement" to protect employees in consolidation cases and other more specific provisions therefor.[8] All the proposals leading to this result similarly dealt with mandatory provisions. We think this legislative history, therefore, can throw little light on the extent of the discretionary authority since 1920 to impose conditions under § 1(20). Indeed, we think the interpretation so clear that resort to such extraneous matters is unnecessary.

7 Chicago, Springfield & St. Louis R. Co. Receiver et al. Abandonment, 236 I. C.C. 765, 772; Chicago, Milwaukee Abandonment, 240 I.C.C. 183.

8 § 5(2)(f) as amended in § 7 of the Transportation Act of 1940, 54 Stat. 905, 49 U.S.C.A. § 5(2)(f).

In the Lowden case, it was argued that the effect of the amendment to § 5 as it appeared in the bill then pending in Congress was to create authority to provide for benefits to labor in consolidation cases because none had existed before. But the Supreme Court rejected this idea, saying "Doubts which the Commission at one time entertained but later resolved in favor of its authority to impose the conditions, were followed by the recommendation of the Committee of Six that fair and equitable arrangements for the protection of employees be 'required.'" It was, said the Supreme Court, this recommendation which was embodied in the new legislation, and the Court added: "We think the only effect of this action was to give legislative emphasis to a policy and a practice already recognized by § 5(4) (b) by making the practice mandatory instead of discretionary, as it had been under the earlier act". And there is a logical reason for this, for admittedly there were in 1920 as also in 1940 two objects sought through the consolidation section—one, to secure an efficient transportation service; the other, the incidental but inevitable financial benefits to the railroads involved. For the result of consolidation, it was expected, would strengthen their ability to operate and to earn a profit and would relieve them from the financial debilitation under which they had labored for many years. Time has demonstrated the reliability of this belief, and what was in 1920 left discretionary had become in 1940 an acknowledged right. To share with displaced personnel a part of the gain was then and now a necessary factor in the accomplishment of an efficient rail system. In the case of abandonment, the primary object of the statute is the same, namely, the preservation of an efficient transportation service, which it is easily understandable might be defeated by excessive expenditures from the common fund in the local interest so as to impair the ability of the carrier properly to serve interstate commerce. Colorado v. United States, supra, 271 U.S. at pages 163, 167, 46 S.Ct. 452, 70 L.Ed. 878. But in the case of an abandonment proceeding the second objective—protection of displaced personnel—might be either unfair or impractical and should not, therefore, be mandatory. If the object of the abandonment is to cut off the dead limb of a railway or if it is the total abandonment of a small system, as was true in the case of the Arlington & Fairfax Railway, as to which we had a part,[9] it conceivably might be wholly unreasonable to add to the burden the further loss in requiring financial support of employees no longer needed. But if, on the other hand, the abandonment like consolidation tends to increase the earnings of the corporate applicant by avoiding unnecessary duplication of service or, as in this case, where the abandonment means not a withdrawal of transportation service from a particular area, but the substitution of bus for rail service and the general rearrangement of the properties and operations of the company, as the result of which both stockholders and the public will benefit, it is difficult to recognize any distinction between such a case and one of consolidation, except that the proceedings in the one case are required to be under Section 1 (18–20) and the other under Section 5(4) (b).

In this view, we are of opinion that it is not permissible to lean too strongly on either the refusal of the Commission for several years to assume the authority which we think it had or the omission of Congress in the recent passage of the Transportation Act to provide it. While it is true the Commission under Section 5 was acting in accordance with a general plan of consolidation which Congress then had in view, it is also true that under Section 1(20) it acts in accordance with the general policy of that plan, and if that policy includes the protection of employee morale with all its implications in the one case, it seems to us it necessarily must include it equally in the other.

We are, therefore, of opinion that the general rule of interpretation of an ambiguous statute, invoked by the Commission, is not applicable for the reason that, since the decision in the Lowden case, the language of Section 1(20) is no longer doubtful but is plain, and thus considered with Section 5(4) (b), harmonizes with the whole Act to the end intended by Congress in its passage. That part of the Commission's report which denies consideration of the employees' petition for lack of power will be set aside, with directions to the Commission to consider the petition and take such action thereon as in the discretion of the Commission is proper.

---

[9] Arlington & Fairfax Auto R. Co. v. Capital Transit Co., 71 App.D.C. 53, 109 F.2d 345.